UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 06-02-01-T |
| ROBERT A. URCIUOLI, FRANCES P. DRISCOLL, PETER J. SANGERMANO, JR., and ROGER WILLIAMS MEDICAL CENTER | ) | |

DEFENDANT PETER J. SANGERMANO, JR.'S
MOTION FOR SEVERANCE

Pursuant to Fed. R. Crim. P. 14(a) and 14(b), defendant Peter J. Sangermano, Jr. ("Sangermano") respectively moves this Court to sever his trial on the charges set forth in the Indictment of the above captioned action, and for an order requiring the government to disclose for in camera review any statements or other evidence pertinent the issue of severance. As grounds therefor, Sangermano states that testimony of codefendant Robert A. Urciuoli ("Urciuoli"), inadmissible against but incriminatory of Sangermano, may be proffered by the government at trial, and thus a potential Bruton problem exists. Because Urciuoli's testimony so plainly and unavoidably points to Sangermano, mere redaction of the testimony would not resolve this Bruton problem. As further grounds, Sangermano states that he and Urciuoli, if jointly tried, would present antagonistic defenses so irreconcilable as to prevent a jury from rendering a reliable judgment as to guilt or innocence. Accordingly, the trial of Sangermano must be severed from that of Urciuoli.[1]

[1] As discovery has not yet been completed and fully reviewed, it is possible that, as this matter proceeds, additional grounds warranting severance of Sangermano's trial from either or both of his codefendants will arise. Accordingly, Sangermano expressly reserves his right to supplement and renew this Motion to

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-02-01-T** |
| **ROBERT A. URCIUOLI, FRANCES P. DRISCOLL, PETER J. SANGERMANO, JR., and ROGER WILLIAMS MEDICAL CENTER** | ) | |

**DEFENDANT PETER J. SANGERMANO, JR.'S**
**MOTION FOR SEVERANCE**

Pursuant to Fed. R. Crim. P. 14(a) and 14(b), defendant Peter J. Sangermano, Jr. ("Sangermano") respectively moves this Court to sever his trial on the charges set forth in the Indictment of the above captioned action, and for an order requiring the government to disclose for in camera review any statements or other evidence pertinent the issue of severance. As grounds therefor, Sangermano states that testimony of codefendant Robert A. Urciuoli ("Urciuoli"), inadmissible against but incriminatory of Sangermano, may be proffered by the government at trial, and thus a potential Bruton problem exists. Because Urciuoli's testimony so plainly and unavoidably points to Sangermano, mere redaction of the testimony would not resolve this Bruton problem. As further grounds, Sangermano states that he and Urciuoli, if jointly tried, would present antagonistic defenses so irreconcilable as to prevent a jury from rendering a reliable judgment as to guilt or innocence. Accordingly, the trial of Sangermano must be severed from that of Urciuoli.[1]

[1] As discovery has not yet been completed and fully reviewed, it is possible that, as this matter proceeds, additional grounds warranting severance of Sangermano's trial from either or both of his codefendants will arise. Accordingly, Sangermano expressly reserves his right to supplement and renew this Motion to

## CONCLUSION

WHEREFORE, for the foregoing reasons, defendant Peter J. Sangermano respectfully requests that his trial be severed from that of codefendant Robert A. Urciuoli, and that an order issue requiring the government to disclose to the Court for in camera review any statements or other evidence relevant to the herein advanced, or other, bases for severance.

Respectfully submitted,

PETER J. SANGERMANO,
By his attorneys,

James P. Redding
A. John Pappalardo
Greenberg Traurig LLP
One International Place
Boston, MA 02110
(617) 310-6000
reddingj@gtlaw.com
pappalardoj@gtlaw.com

Dated: April 7, 2006

---

Sever, and to seek oral argument and/or evidentiary hearing thereon under L.R. Cr. 47(e). See, e.g., Schaffer v. United States, 362 U.S. 511, 516 (1960) (courts have continuing obligation to monitor trial for prejudice, and order severance should it arise).

**CERTIFICATION**

I certify that I caused a copy of the within Defendant Peter J. Sangermano, Jr.'s Motion to Sever to be mailed on April 7, 2006 to counsel of record, as stated below:

Robert Clark Corrente
United States Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Gerard B. Sullivan
Criminal Chief
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Luis M. Matos
Assistant U.S. Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Dulce Donovan
Assistant U.S. Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

William P. Devereaux (Counsel for Roger Williams Medical Center)
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

Thomas Frongillo (Counsel for Roger Williams Medical Center)
Weil Gotshal & Manges LLP
100 Federal Street
Floor 34
Boston, MA 02110

Kevin J. Bristow (Counsel for Frances P. Driscoll)
505 Turks Head Building
Providence, RI 02903

Robert G. Flanders, Jr. (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903

Kristie M. Passalacqua (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903

Michael J. Connolly (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
28 State Street
2nd Floor
Boston, MA 02109

Richard M. Egbert (Counsel for Robert A. Urciuoli)
99 Summer Street
Suite 1800
Boston, MA 02110

James P. Redding

#187619

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-02-01-T** |
| **ROBERT A. URCIUOLI, FRANCES P. DRISCOLL, PETER J. SANGERMANO, JR., and ROGER WILLIAMS MEDICAL CENTER** | ) | |

**DEFENDANT PETER J. SANGERMANO, JR.'S**
**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SEVERANCE**

Pursuant to Fed. R. Crim. P. 14(a) and 14(b), defendant Peter J. Sangermano, Jr. ("Sangermano") respectively moves this Court to sever his trial on the charges set forth in the Indictment of the above captioned action, and for an order requiring the government to disclose for in camera review any statements or other evidence pertinent the issue of severance. As grounds therefor, Sangermano states that testimony of codefendant Robert A. Urciuoli ("Urciuoli"), inadmissible against but incriminatory of Sangermano, may be proffered by the government at trial, and thus a potential Bruton problem exists. Because Urciuoli's testimony so plainly and unavoidably points to Sangermano, mere redaction of the latter's name would not resolve this Bruton problem. As further grounds, Sangermano states that he and Urciuoli, if jointly tried, would present antagonistic defenses so irreconcilable as to prevent a jury from rendering a reliable judgment as to

guilt or innocence. Accordingly, the trial of Sangermano must be severed from that of Urciuoli.[1]

## FACTS

Sangermano, along with codefendants Urciuoli and Frances P. Driscoll ("Driscoll"), was indicted on January 5, 2006 on charges of conspiracy and mail and wire fraud, all predicated on an alleged scheme to defraud the Rhode Island citizenry of the honest services of former state senator John A. Celona ("Celona").

Prior to his indictment, Urciuoli was called before, and on April 7, 2004 provided testimony to, a Rhode Island Grand Jury. In the course of his testimony, Urciuoli repeatedly made statements that are facially incriminatory of Sangermano, falsely implicating him. By way of non-exhaustive example, Urciuoli testified:

> Q So, is it your testimony that Mr. Sangermano was part of the process in the decision making to hire --
>
> A Yes.
>
> Q Mr. Celona?
>
> A Yes, he was.
>
> * * *
>
> A . . . So, effectively, when I recommended that John Celona be hired, he was hired by Peter Sangermano's management service company, and they were paid to do that from both partnerships.

Urciuoli's April 7, 2004 Grand Jury Testimony ("Urciuoli G.J. Test.") at 21, li. 4-8, 21-24.

---

[1] As discovery has not yet been completed and fully reviewed, it is possible that, as this matter proceeds, additional grounds warranting severance of Sangermano's trial from either or both of his codefendants will arise. Accordingly, Sangermano expressly reserves his right to supplement and renew this Motion to Sever, and to seek oral argument and/or evidentiary hearing thereon under L.R. Cr. 47(e). See, e.g., Schaffer v. United States, 362 U.S. 511, 516 (1960) (courts have continuing obligation to monitor trial for prejudice, and order severance should it arise).

Q Your perception was when, when Mr. Celona called you about getting some work, was that this would be a good spot for him to be? A good spot to plug him in?

A Well, the answer was, yes, I thought it would be a good idea. I thought he could be helpful for seniors, but I really left the, you know, the working out of the details, I guess, so-to-speak --

Q Yeah?

A -- to, to Fran, to Jim and, ultimately, to Peter Sangermano, but I, certainly, was very supportive and favorable.

Id. at 22, li. 12-22.

Q It still brings me back to why is not your or Fran Driscoll's name on this contract, when he's working for Elmhurst, which has nothing to do with Mr. Sangermano? Is there a reason for that?

A Again, the, the, the legal reason is that we, we, we don't manage the facility. The management company is really the company that hired Peter, but the agreement that we had was that the realty corporation would take care of his salary.

Q Right.

A And that was, again, that was clearly spelt out on, on realty letterhead, I believe.

Q And that, that would be, also, part of number, No. 42. That would be this letter, June 17th, 1998, Roger Williams Realty Corporation, signed by you?

A Yes. And this was confirmation to Peter regarding the financial arrangements through realty corporation. Yes.

Q So, under this arrangement, Mr. Sangermano or the Village at Elmhurst pays Mr. Celona, initially, $700.00 a week?

A Yes.

Q Cut him a check for $700.00 a week, and, then, the Village at Elmhurst is, or Mr. Sangermano's half of the Village at Elmhurst is, then, reimbursed by the Roger Williams Realty Corporation for those expenses. Correct?

A Yes, or, if it were profitable, it would come out of our end, our end of --

Q Right.

A -- the profits.

Q In any event, Mr. Sangermano's half of the Village at Elmhurst is not paying a penny initially?

A At least initially, yes.

Id. at 30, li. 14-25, and 31, li. 1-22.

Q Six years. During those six years, how often would you meet with Senator Celona on Village at Elmhurst issues?

A I, that's kind of hard to say. I guess, I'd say, sporadically. You know, sometimes more, sometimes less depending on what was going on.
Again, I didn't have primary responsibility for what John Celona was doing. I mean, he had, his major responsibility, I guess, I suspect, was probably in two areas. One, you know, with Fran Driscoll on my staff, and, also, directly with Peter Sangermano and his staff; so I would meet with him sporadically.

* * *

Q . . . So, it would be fair to say that he met probably more often with Fran Driscoll than with you?

A Clearly, more, more often with Fran.

Q And more often with Sangermano than you?

A I don't know that for sure, but I --

Q Okay.

A -- suspect he would. Yes.

Q Who is his boss? Who supervised him? Who did he report to?

A To Peter Sangermano from the standpoint of his responsibilities with the Village, and, also, on my staff, Fran, who, again, managed

a lot of our senior programs and our public relations and government relations. Yes.

Id. at 38, li. 23-25; at 39, li. 1-9 & 15-25; at 40, li. 1-2.

Q But, correct me if I'm wrong, there was nowhere here that you signed it [the consulting agreement]. I mean, this is between Peter Sangermano, the Village at Elmhurst, Peter Sangermano and John Celona?

A That's correct.

Q This is not between you and John Celona?

A Right.

Q It's not between Roger Williams Realty, Roger Williams Medical, anybody but the Village at Elmhurst and John Celona?

A The day-to-day management, yes, but, again, in the, in the Ethics agreement, we, clearly, articulated that there were related entities there, and, you know, that we knew that, indirectly, you know, there was, there was relationships there.
So, again, I, we're not, I'm not trying to hide anything. We, I think we pointed that out, but you're right. In terms of the day-to-day stuff he was doing for Peter Sangermano, I, I'm not aware of that.

Id. at 68, li. 11-25; at 69, li. 1-4.

A Again, he [Celona], he never got a paycheck from the hospital of from the medical center. All of his consulting checks, as I understand it, came directly from Peter Sangermano's company.

Q But, but as I understand it, there was an agreement between yourself and Peter Sangermano or, you know, the entities that you both --

A Um-hum.

Q -- lead, that the Roger Williams Realty Corp[.] or Roger Williams Medical Center would, basically, be either fronting the money, or if they weren't fronting the money, deducting the money from what your profits otherwise would have been. So, basically, it would be coming out of your share?

A Yes.

Id. at 87, li. 8-17.

Q Did he [Celona] ever share with you or just mention to you that, you know, they haven't paid me yet, or I'm still waiting to get paid from the Village?

A Maybe once or twice in the six or seven years he mentioned that to me, yes.

Q And what would you respond to him? Did you tell him, "I'll call Peter Sangermano"?

A I told him, basically, to call Peter Sangermano or perhaps, and I don't, I don't know. It would be a struggle for me to remember. Perhaps I might have called and, and asked where his check was if it was late. I mean, I, I think, he was doing the work. You know, he should have been paid.

Id. at 88, li. 6-18.

Q Did he, I mean, I know you've said that you thought he [Celona] was doing a good job . . . were there records kept somewhere, either at the Elmhurst Nursing Home, or at the Village, where, when people come in and they write down . . . "How did you come here?" and you write, "Referred," and they write, "By who?"

A Um-hum.

Q Were people writing down John Celona that you could sort of keep track of how many people were coming through John Celona?

A I'm, to be honest with you, I'm not sure. I don't know what record keeping Peter Sangermano had, and . . . going back in Fran's file, it seems like there was some pretty regular correspondence between John and Fran, and some involving his job . . . .

Q How involved was Fran in the operation . . . of the Village at Elmhurst?

A Again, all of us have responsibilities for multiple corporations. So, she would be involved, but, again, you know, the day-to-day management was all Peter and Diane Sangermano.

Id. at 92, li. 4-25; at 93, li. 1.

A So, we knew that he [Celona] was out there. He was, he was active. You know, Fran seemed comfortable with what he was doing, and I would meet with Peter Sangermano once or twice a year, and I think the both of us, you know, saw his performance as being good, and that's why we renewed the contract.

Id. at 94, li. 3-8.

Q Well, who would have proposed that [a raise for Celona]? I mean, if you're getting someone for $700.00 a week, was he --

A I --

Q -- going to walk?

A I don't know that we ever had that discussion, but I think that we were satisfied, and I, and I, honestly, don't recall. I mean, it either was one of two things. Either he came to us and said, you know, "Is there," you know, "Is there more money for me?" You know, "I'm doing a good job." Or, you know, Peter and I said, you know, "That he deserved more money," and my guess is it's probably a combination of both . . . .

Id. at 95, li. 16-25; at 96, li. 1-2.

Q With each passing month or each passing senate year, he [Celona] became more influential correct?

A I think, I think in his position in the Senate. Yes.

Q And he's Chairman of what committee?

A He was Chairman of Corporations.

Q Which affects you?

A Yes.

Q And he's a player on the state stage in health care issues. Correct?

A Yes.

Q He's got the TV show. Right?

A He does.

Q Right?

A He does.
Q And, God love him, the seniors just can't get enough of him. Right? Right?

A Yes.

Q And, as those years went by, he's getting six percent a year from you, from Mr. Sangermano to be the outreach person of the Village at Elmhurst. Correct?

A Um-hum.

Q And, yet, we get all this stuff here that has nothing to do with seniors. It has to do with hospital issues. Correct?

A Correct.

Id. at 102, li. 1-25; at 103, li. 1-6.

Q[2] Good afternoon. When you would sit, on a yearly basis, when it was renewal time for the contract --

A Yes.

Q -- for Mr. Celona, you would sit with Mr. Sangermano?

A Yes.

Q Was that kind of in a, like a performance review situation? You'd actually pull the contract out, discuss amongst the two of you to see whether or not he's meeting the obligations of that contract?

A That's correct.

Q Was Mr. Celona present at that time?

A No, he --

Q Was he ever present during that?

A No, he was not present during those discussions. One or both of us, I guess, would get back to him to let him know how those discussions went.

---

[2] Questioning in this instance was by a Grand Juror.

Id. at 114, li. 22-25; at 115, li. 1-14.

Q[3] During those subsequent, subsequent conversations, did you ever, in discussing with Mr. Sangermano, notice or pull a that --- you said you get correspondence that's file [sic] according to some your read and some you don't.
Did you ever pull the Celona file just to kind of update yourself with the activities of your consultant?

A Occasionally, I, I guess I would, but that, I wouldn't do that normally. I think I, from my perspective, I kind of focused on the overall performance of the Senator, and, again, I have, you know, Fran Driscoll working on one part of what he was doing.

Q Um-hum.

A Peter Sangermano, you know, was the person who was really running the day-to-day part of the Village, and, so, I would get to Peter and ask him, you know, "Are you comfortable with what's going on?" "Are you," you know, "Are we getting value for, you know, for what he's doing?" We'd have that kind of a discussion yes.

Id. at 116, li. 7-25.

Q[4] One quick question. You said that you and Mr. Sangermano decided on the raises for Mr. Celona, giving him the raise?

A Yes.

Q Who prepared the initial agreement, so-to-speak?

A Mr. McGuirk, our legal counsel, prepared the original agreement.

Q And with, with you or by himself?

A He did that primarily with Fran Driscoll and, also, with Mr. Sangermano.

Q Was there any, like, every year you said that he was renewed. Was a paper signed every single year in February, or was it just we're renewing --

---

[3] Questioning here was by a Grand Juror.
[4] This questioning was by a Grand Juror.

A To the --

Q -- you, and this is how much you're going to make it?

A To the best of my knowledge, I mean, typically, if it were strictly the hospital, I would insure that the contract gets signed because it would have been my responsibility to sign it, but, again, we didn't, you know, it was, it was Peter Sangermano's responsibility. So, we, I looked at the contract. You know, a lot of times we would make notes and send them along, but I, you know, primarily, it was Peter who probably would have done that.

Q Did Peter ever tell you that he received, I won't say, "updates", but communications from Mr. Celona? Did he ever tell you, "Oh, he, he told me that he did this, that and that"? Or --

A Yes. I mean, I, I don't know whether I received anything formally from him, but, in my conversations with him, yes, he did.

Id. at 121, li. 18-25; at 122, li. 1-24.

These statements are facially incriminatory of Sangermano, and demonstrate further that Sangermano and Urciouli have diametrically opposed views and material differences as to core and fundamental facts: Celona either reported to Sangermano as Urciouli has testified, or he did not; Sangermano either decided on Celona's salary with Urciouli as the latter testified, or he did not; Sangermano either had responsibility for the contract with Celona, as Urciouli has testified, or he did not.

It is unclear at present as to whether or not the government intends to introduce some or all of the preceding statements, or other statements incriminatory of but inadmissible as to Sangermano, against Urciuoli at trial.

## STANDARD OF REVIEW

"[W]hether to grant or deny a severance is a matter committed to the trial court's sound discretion." United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990). While there is a presumption that "those who are indicted together should be tried together,"

United States v. Baltas, 236 F.3d 27, 33 (1st Cir. 2001) (internal quotation omitted), and "severance is especially disfavored in conspiracy cases," United States v. Pẽna-Lora, 225 F.3d 17, 33 (1st Cir. 2000), this is merely where the analysis begins, and not where it ends. See Zafiro v. United States, 506 U.S. 534, 545 (1993) ("And in all cases, the ***Court should be mindful of the serious risks of prejudice and overreaching that are characteristic of joint trials, particularly when a conspiracy count is included*** in the indictment.") (Stevens, J., concurring) (emphasis added).

In a criminal trial, where powerful liberty interests are at stake and the need for protective trial rights and safeguards at its apex, individualized fairness must not be sacrificed at the alter of efficiency. As one court cautions in connection with the efficiency gains of joint trials: "At the same time, Rule 14 directs the court to ask, in effect - at what price judicial economy? - particularly with respect to individual defendants. There is no question that joint trials, involving defendants with different degrees of culpability, can raise a substantial risk of prejudice, that evidence of a codefendant's wrongdoing might erroneously lead the jury to convict the defendant, that exculpatory evidence that would be available to a defendant tried alone may well be unavailable in a joint trial." United States v. Green, 324 F. Supp.2d 311, 319 (D. Mass. 2004) (footnote omitted). Accordingly, Rule 14(a) provides that:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial ***appears to prejudice*** a defendant or the government, the Court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. Pro. 14(a) (emphasis added).

In addition to its wide discretion under Rule 14, the Court enjoys independent authority to grant severance under its case management authority, even absent trial

prejudice. "The power to order separate trials rests within the broad discretion of the District Court as an aspect of its inherent right and duty to manage its own calendar." United States v. Leichter, 160 F.3d 33, 35-36 (1st Cir. 1998) (internal quotations omitted); see also United States v. DeCologero, 364 F.3d 12, 25 (1st Cir. 2004).

On appeal, rulings on severance are subject to review "for any manifest abuse of discretion which deprived appellant of a fair trial or resulted in a miscarriage of justice." United States v. Baltas, 236 F.3d 27, 33 (1st Cir. 2001).

## ARGUMENT

### A. SANGERMANO'S TRIAL SHOULD BE SEVERED FROM THAT OF URCIOULI TO PREVENT UNFAIR PREJUDICE IN THE FORM OF DEPRIVING SANGERMANO OF HIS TRIAL RIGHT TO CONFRONTATION, AND TO ENABLE A JURY TO RENDER A RELIABLE JUDGMENT AS TO INNOCENCE OR GUILT.

#### 1. The Introduction of Codefendant Urciuoli's Facially Incriminating Testimony in a Joint Trial Would Deprive Sangermano of His Right of Confrontation and Cause Unfair Prejudice under *Bruton*.

The right of the accused to confront witnesses against him is a bedrock trial right, expressly protected in the Confrontation Clause of the Sixth Amendment. Crawford v. United States, 541 U.S. 36, 42 (2004). "It is well-established that the out-of-court statements of a non-testifying defendant, even if admissible against the declarant, may not be used against a jointly tried codefendant unless otherwise independently admissible against that codefendant." United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005). In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the statements of a non-testifying, declarant codefendant, inadmissible as to but incriminatory of defendant, could not be introduced at trial even with a limiting instruction to the jury to consider the statements only as against the declarant

codefendant, without unfair prejudice resulting to the defendant. Id. at 135-37. Even though juries are presumed to follow instructions, the situation presented too great a risk of jury confusion and prejudice to the non-declarant defendant to permit the declarant codefendant's statements. Id. at 135-36 ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").

The curative response to a Bruton problem, where possible, is to redact the statements to remove information identifying or referencing the existence of the non-declarant codefendant, coupled with a limiting instruction. See Richardson v. Marsh, 418 U.S. 200, 211 (1987); Vega Molina, 407 F.3d at 519 (defendant declarant's out-of-court statement "generally will be admitted if it is redacted to delete the codefendant's name and any reference, direct or indirect, to his or her existence") (citing Richardson).

"In the ordinary course, the court is to grant severance 'if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Green, 324 F. Supp.2d at 324 (quoting Zafiro, 506 U.S. at 539).

In the instant case, the introduction at trial of the statements of Urciouli, facially incriminating of, but inadmissible against Sangermano, inescapably violates Sangermano's trial right of Confrontation as to the declarant codefendant, and operates to prevent the jury from making a reliable judgment as to Sangermano's innocence or guilt. It is anticipated that Urciouli will not testify at trial, precluding his cross-examination

with respect to any of the statements incriminatory of Sangermano. Accordingly, Sangermano's trial must be severed from that of Urciouli to prevent unfair prejudice.

a. The Unfair Prejudice Arising from Urciouli's Testimony Is Not Curable by Redaction and Limiting Instructions.

The subject statements here, in view of their specificity, and the fact there are but two individual defendants other than the declarant, precludes resort to complete redaction of references to the existence of others, or the redaction of Sangermano's name and the use of neutral phrases such as "another person" to overcome this Bruton problem. It would be impossible for jurors not to fill such anonymous gaps with Sangermano's identity, in the context of references to, for example, the management of the Village: Sangermano is identified as such in the Indictment, and the remaining codefendant, Driscoll, is not.

This is akin to the situation the Supreme Court confronted in Grey v. Maryland, 523 U.S. 185 (1998), where it held that where the redaction is so obvious -- in that case, the defendant's name was substituted with blanks and the word "deleted" -- as to lead the jury through ordinary inferences directly to the identity of the defendant, the protective rule of Bruton applies. 523 U.S. at 192, 197. The Court found that these blank spaces, entries of "deleted" or a "similar symbol or other obvious indications of alteration," id. at 192, as a class, so closely resemble the unredacted statement found not to comport with the Sixth Amendment in Bruton as to require the same treatment. Id. As the Court explained, a jury will often realize that a confession redacted in this way refers to the non-declarant defendant, id. at 193,[5] and may operate to specially call the jury's attention

[5] "Consider a simplified but typical example, a confession that reads 'I, Bob Smith, along with Sam Jones, robbed the bank.' To replace the words 'Sam Jones' with an obvious blank will not likely fool anyone. A juror somewhat familiar with criminal law would know that the blank . . . refers to defendant Jones. A

to the redaction, encouraging speculation, and "may overemphasize the importance of the confession's accusation -- once the jurors work out the reference." Id.

This problem of redaction is most pronounced where there are fewer non-declarant defendants. As the First Circuit has explained, while in a case with "numerous events and actors" it is possible "that no direct inference plausibly can be made that a neutral phrase like 'another person' refers to a specific codefendant," before Your Honor is a "different case" that "involve[s] so few defendants that the statement leaves little doubt in the listener's mind about the identity of 'another person.'" Vega Molina, 407 F.3d at 520 (citations omitted); see also United States v. Suplimet Corp., 366 F. Supp.2d 1175, 1178 (S.D. Fla. 2005) (court tentatively determined hearsay statements, while admissible against declarants, "probably not admissible in a joint trial even in a redacted version with limiting instructions because they tend to implicate at least some of the Co-Defendants").

At best, assuming that in theory the incriminatory statements could be sanitized so as to be completely neutral as to the identity of the referenced non-declarant codefendant, there would be a 50-50 chance of a juror inferring a given reference pertained to Sangermano, as opposed to the other non-declarant defendant, Driscoll. See Gray, 523 U.S. at 196 ("The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."). Such self-evidently prejudicial conditions materially and adversely impact the validity of a jury's judgment as to guilt or innocence, and are

---

juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to Jones, sitting at counsel table, to find what will seem the obvious answer . . . ." 523 U.S. at 193.

incompatible with the protections of the trial right of Confrontation and Bruton. This problem is compounded, of course, by the fact that the same problem also exists with respect to Urciuoli's statements as to Driscoll: following their redaction to assumed neutrality, there would be a 50% chance of a fact finder mistakenly linking them to Sangermano.[6]

These circumstances invite unfair prejudice, undermine Sangermano's fundamental trial right of Confrontation, and inject into the proceedings a palpable concern that a jury will be unable to provide a reliable judgment as to the guilt or innocence of the respective defendants. Recall the specific language of Rule 14(a) for when severance may be appropriate -- where joinder "appears to prejudice." However specific the showing of likely prejudice, there is, and can be, no absolute certainty until it is manifest, and then it is too late. "Finally, and most importantly, without the benefit of hindsight, severance ensures that the end result will be impartial and reliable." United States v. Ayala Lopez, 319 F. Supp.2d 236, 240 (D.P.R. 2004) (granting severance of capital defendant from non-capital defendants). As the Supreme Court has stated in unequivocal terms, when as here "testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Crawford, 541 U.S. at 69-70. Absent confrontation, Sangermano's trial must be severed from that of Urciouli.

**2. Sangermano and Urciuoli Will Present Antagonistic Defenses so Irreconcilable in Their Fundamental Disagreements over Core and Basic Facts as to Prevent a Jury from Rendering a Reliable Judgment as to Innocence or Guilt.**

[6] Consider, as one First Circuit district court has noted, "social scientists have studied the impact on the jury of hearing about misconduct . . . . They have described a 'halo effect,' meaning that once a juror hears about misconduct, he transmutes that bad act into evidence of a bad character, which deflects the juror from fairly assessing the evidence." Green, 324 F. Supp.2d at 319 n.4.

While it is not possible to fully brief the issue in view of the incomplete state of discovery, it appears highly likely that a further basis for severance may arise based on irreconcilable defenses as between, at least, Sangermano and Urcioli. This likelihood is rooted in the fact that, based upon his Rhode Island Grand Jury testimony, Urcioli has falsely and fraudulently implicated Sangermano in acts and events relating to the charges of the Indictment, constituting disagreements over core, basic facts, central to the presentation of each man's defense. For this reason, it is evident that an irreconcilable defenses issue, one where to believe Urcioli's defense, the jury would necessarily have to disbelieve Sangermano's defense, may well arise.

To support severance, the antagonistic defenses must be "so irreconcilable as to involve fundamental disagreement over core and basic facts." Pẽna-Lora, 225 F.3d at 34 (citations omitted). Put differently, the antagonism between defenses must be such that a jury will inappropriately infer that either or both of the proponents are guilty. United States v. Talavera, 668 F.2d 625, 630 (1st Cir. 1982); Green, 324 F. Supp.2d at 324 (same). Put yet another way, 'the antagonism . . . must be such that if the jury believes one defense, it is compelled to convict the other defendant." United States v. Woods, 210 F.3d 70, 79 (1st Cir. 2000) (internal quotation and citation omitted).

While this standard has teeth, courts "are not blind to the fact that 'the dangers inherent in joint trials become intolerable when the co-defendants become gladiators [. . . . ] [and in their] antagonism, each lawyer becomes the government's champion against the co-defendant [. . . .]' This danger is heightened given that no due process or prior notice requirements attach to Co-defendants, resulting essentially in the trial by ambush that the modern discovery procedure rules and court orders to that affect were explicitly

designed to prevent." Ayala Lopez, 319 F. Supp.2d at 238-39 (quoting United States v. Romanello, 726 F.2d 173, 182 (5th Cir. 1984)).

In Green, the court found that the antagonistic defenses advanced by two defendants in a capital case, that the other was the sole shooter in a murder, required severance under Rule 14 as the defenses were mutually exclusive. "There is a considerable risk that each defendant, ably throwing pot-shots at the other, would make the government's case for it. Specifically, in the din, a juror could say: 'I cannot figure out who did the shooting, given the defendants' mutual accusations, but it doesn't matter. They were involved somehow and that is enough.' That conclusion would redound to the government's benefit." Green, 324 F. Supp.2d at 325.

Here, there are fundamental differences as to core and fundamental facts: Celona either reported to Sangermano as Urciouli has testified, or he did not; Sangermano either decided on Celona's salary with Urciouli as the latter testified, or he did not; Sangermano either had responsibility for the contract with Celona, as Urciouli has testified, or he did not. Sangermano and Urciouli have diametrically opposed views on these central, basic facts which will inevitably compel the mounting of highly antagonistic defenses.

Even if the Court determines that the antagonistic defenses "may not fully meet the mutually exclusive standard, there will be substantial and significant differences in the tactical approaches taken by their respective counsel. At times they will have different positions on evidentiary objections, and different approaches to the cross-examination of the government's witnesses and in the presentation of defense witnesses." United States v. McVeigh, 169 F.R.D. 362, 370 (D. Colo. 1996) (severing trials of

defendants in capital case). The Court, in its broad discretion, and pursuant to its case management powers, may nevertheless appropriately order severance.

## B. PURSUANT TO RULE 14(b), THE GOVERNMENT SHOULD PRODUCE TO THE COURT, IN CAMERA, WITNESS STATEMENTS OR OTHER WITHHELD DISCOVERY RELEVANT TO SEVERANCE.

Rule 14(b) provides that prior to "ruling on a defendant's motion to sever, the court may order an attorney for the government to deliver to the court for an in camera inspection any defendant's statement that the government intends to use as evidence." Fed. R. Crim. P. 14(b).

Because the government has not as of this date fully complied with its discovery obligations, in order to resolve the issues raised herein and potential severance issues not yet identified, Sangermano respectfully requests that the Court enter an order directing the government to file with Your Honor for in camera review witness statements or other withheld discovery that are relevant to the herein advanced, or other, bases for severance. See, e.g., United States v. DePietro, No. S502CR.1237(SWK), 2005 WL 783357, *6 (S.D.N.Y. April 6, 2005) (discussing in camera review by court pursuant to Rule 14(b)).

## CONCLUSION

WHEREFORE, for the foregoing reasons, defendant Peter J. Sangermano respectfully requests that his trial be severed from that of codefendant Robert A. Urciuoli, and that an order issue requiring the government to disclose to the Court for in camera review any statements or other evidence relevant to the herein advanced, or other, bases for severance.

Respectfully submitted,

PETER J. SANGERMANO,
By his attorneys,

James P. Redding
A. John Pappalardo
Greenberg Traurig LLP
One International Place
Boston, MA 02110
(617) 310-6000
reddingj@gtlaw.com
pappalardoj@gtlaw.com

Dated: April 7, 2006

## CERTIFICATION

I certify that I caused a copy of the within Defendant Peter J. Sangermano, Jr.'s Memorandum in Support of Motion to Sever to be mailed on April 7, 2006 to counsel of record, as stated below:

Robert Clark Corrente
United States Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Gerard B. Sullivan
Criminal Chief
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Luis M. Matos
Assistant U.S. Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

Dulce Donovan
Assistant U.S. Attorney
United States Attorney's Office - District of Rhode Island
50 Kennedy Plaza, 8th Floor
Providence, RI 02903

William P. Devereaux (Counsel for Roger Williams Medical Center)
Holland & Knight LLP
One Financial Plaza, Suite 1800
Providence, RI 02903

Thomas Frongillo (Counsel for Roger Williams Medical Center)
Weil Gotshal & Manges LLP
100 Federal Street
Floor 34
Boston, MA 02110

Kevin J. Bristow (Counsel for Frances P. Driscoll)
505 Turks Head Building
Providence, RI 02903

Robert G. Flanders, Jr. (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903

Kristie M. Passalacqua (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903

Michael J. Connolly (Counsel for Robert A. Urciuoli)
Hinckley, Allen & Snyder LLP
28 State Street
2nd Floor
Boston, MA 02109

Richard M. Egbert (Counsel for Robert A. Urciuoli)
99 Summer Street
Suite 1800
Boston, MA 02110

James P. Redding

#186671