**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CR 06-02-3T** |
| | : | |
| **ROBERT A. URCIUOLI,** | : | |
| **FRANCES P. DRISCOLL, and** | : | |
| **PETER SANGERMANO, JR.,** | : | |

**UNITED STATES' OBJECTION TO DEFENDANT**
**SANGERMANO'S MOTION TO DISMISS THE INDICTMENT**

On April 3, 2006, Defendant Peter Sangermano filed a Motion to Dismiss the Indictment. For the reasons stated in the accompanying memorandum of law filed simultaneously herewith, the United States objects to the motion.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

Dated: April 17, 2006

LUIS M. MATOS
DULCE DONOVAN
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April, 2006, I caused to be sent by first class regular mail a true copy of the within United States' Objection to Defendant Sangermano's Motion to Dismiss the Indictment to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Kevin J. Bristow, Esq.
501 Turks Head Building
Providence, RI 02903

John A. Pappolardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Michael J. Connolly
Hinckley Allen Snyder LLP
28 State Street
Boston, MA 02109

[signature]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CR 06-02-3T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, and | : | |
| PETER SANGERMANO, JR. | : | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT SANGERMANO'S MOTION TO DISMISS THE INDICTMENT**

## I. Introduction

On January 5, 2006, a federal grand jury returned an Indictment charging Defendants Robert A. Urciuoli, Frances P. Driscoll, and Peter J. Sangermano with conspiracy to commit honest services mail fraud.[1] The Indictment also charges Defendant Driscoll with one count of honest services mail fraud and Defendants Urciuoli and Sangermano with thirty-six counts of honest services mail fraud. On April 3, 2006, Defendant Sangermano filed a Motion to Dismiss the Indictment.[2]

Defendant makes several arguments in support of his motion. In doing so, Sangermano incorporates the arguments which Defendant Urciuoli makes in support of his motion. Similarly, the United States requests denial of Sangermano's motion on the grounds asserted in its objection

[1] The Indictment also named Roger Williams Medical Center ("RWMC") in Counts 1 and 3-38. As the Court is aware, subsequent to the Indictment being filed, Defendant RWMC entered into a Deferred Prosecution Agreement ("DPA") with the United States. Pursuant to the terms of the DPA, and the United States' Motion to Dismiss RWMC from the Indictment, on April 8, 2006, the Court dismissed RWMC from the case.

[2] Defendants Urciuoli and Driscoll have filed separate motions to dismiss. The United States is filing separate objections, addressing those motions.

to Defendant Urciuoli's motion, as well as the bases asserted in this memorandum.

Sangermano also contends that the Indictment fails to allege sufficient facts connecting him to Celona's work on behalf of RWMC and the deception perpetrated upon the Rhode Island Ethics Commission and the public. He maintains that the Indictment language includes allegations that Celona was working for the Village. Thus, Sangermano argues, the Indictment itself contradicts any contention by the United States that the Consulting Agreement between Celona and the Village at Elmhurst was a ruse designed to hide the fact that Celona was really working for RWMC. Sangermano also argues that since the crime of honest services mail fraud requires that he act knowingly and purposely, any suggestion by the United States that his criminal liability hinges upon his reckless disregard of the fraud being perpetrated by his codefendants cannot stand.

Sangermano's arguments fail. The Indictment contains more than sufficient allegations against Sangermano to hold him criminally liable on both Count 1, conspiracy to commit honest services mail fraud, and Counts 3-38, honest services mail fraud. A fair reading of the Indictment demonstrates that without Sangermano's participation in the scheme – i.e. entering into a contract he opposed and allowing Celona's payments from RWMC to pass through the Village – the scheme would not have been accomplished. In addition, the Indictment charges that Sangermano is not only criminally liable as a principal, but as an aider and abettor. Thus, the Indictment need not allege that he participated in every aspect of the scheme to defraud. Furthermore, Sangermano is incorrect in stating that he cannot be held liable on the theory that he recklessly disregarded the actions of his codefendants – he can. See United States v. Gay, 967 F.2d 322, 326 (9th Cir. 1992) ("We have repeatedly held that reckless indifference alone will

support a mail fraud conviction."). Moreover, Sangermano can also be held liable on the theory that he consciously avoided ascertaining the truth of the statements of his codefendants. See United States v. Brien, 617 F.2d 299, 312 (1st Cir. 1979) (stating that conscious avoidance is merely subset of specific intent and applicable where defendant avoided knowing truth of his statements). Accordingly, Sangermano's motion should be denied.

## II. Factual Background

The following facts are drawn exclusively from the Indictment.[3]

Throughout the relevant time period, Defendant Urciuoli was the President and Chief Executive Officer of RWMC. Indictment ¶ 1 (hereinafter "Indict."). From 1989 until May of 2000, Defendant Driscoll was Senior Vice-President, External Affairs, Corporate Communications and Development for RWMC. Id. ¶ 2. Defendant Sangermano was a principal of Village Retirement Communities, LLC, a not-for-profit corporation dedicated to developing and operating assisted living facilities. Id. ¶ 3.

RWMC was the parent company for Roger Williams Hospital (the "Hospital") and the the sole member and shareholder in Roger Williams Realty Corporation ("Roger Williams Realty"), a corporation that owned and managed real estate for the benefit of RWMC, and Elmhurst Extended Care Facilities, Inc., a skilled nursing and intermediate care facility. Id. ¶ 4.

---

[3] As discussed more extensively in the United States' Memorandum in Support of its Objection to Urciuoli's Motion to Dismiss the Indictment, in deciding Defendants' motions to dismiss, the Court is limited to considering the facts alleged in the Indictment and is bound to accept those facts as true. See United States v. Sampson, 371 U.S. 75, 78-79 (1962). Despite Sangermano relying extensively on facts outside the four corners of the Indictment, the United States limits its discussion of the relevant facts to those alleged. Moreover, the United States' recitation of facts focuses in particular on the allegations relating to Sangermano. A more complete recitation of facts underlying the criminal charges can be found in the Unites States' Memorandum in Support of its Objection to Urciuoli's motion, or in the Indictment itself.

The Village at Elmhurst, LLC (the "Village"), was an assisted living facility that was equally owned by Roger Williams Realty and SANAT Properties, LLP. SANAT was a partnership between Village Retirement Communities and NATCO Products, Inc. Id.

Generally, the Indictment charges that from August of 1997 through January 8, 2004, Defendants Urciuoli, Driscoll, and Sangermano conspired with John Celona, a former Rhode Island State Senator,[4] to defraud the citizens of the State of Rhode Island of their intangible right to the honest services of Celona, and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.[5] Indict. ¶ 14. The objects of the conspiracy were: (1) to pay money to Celona, pursuant to a consulting agreement, "so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates; and (2) to deceive the State of Rhode and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates." Id. ¶¶ 15, 16.

The Indictment sets forth the process by which Defendants caused Celona to enter into a consulting agreement with the Village in order to provide Celona with money in exchange for his political support on matters of interest to RWMC and the Village pending before the Rhode

[4] Celona was a State Senator from January 2, 1995, through on or about March 9, 2004. From January 4, 2001, through December 11, 2003, Celona was the Chairman of the Senate Corporations Committee, which possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and pharmacies. Id. ¶¶ 6, 7.

[5] In a separate case, pursuant to a Plea Agreement with the United States, on August 25, 2005, Celona plead guilty to an Information charging one count of honest services mail fraud.

Island General Assembly. In essence, Defendants hired Celona as a consultant for the Village to work on issues relating to senior affairs while their true purpose was to have Celona perform duties for RWMC and report to Frances Driscoll. Id. ¶¶ 21-25. Indeed, paragraph 25 of the Indictment alleges:

> On various dates, from on or about October 15, 1997, to on or about July 22, 1998, URCIUOLI, DRISCOLL and SANGERMANO caused the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported be a consulting agreement between Celona and the Village which stated that "[t]he management of the Village at Elmhurst wishes to engage you, John Celona (the "Consultant") to provide the following services on behalf of the Village of Elmhurst and Elmhurst Extended Care ("Elmhurst")," when URCIUOLI, DRISCOLL and SANGERMANO all knew that the true nature of the employment agreement was for Celona to perform duties for RWMC and to report to DRISCOLL.

Celona's consulting agreement with the Village was a way of hiding Celona's relationship with RWMC from the State of Rhode Island and its citizens, allowing Celona to promote RWMC's political interests in his official capacity without revealing the true nature of Celona's work relationship to RWMC and the attendant conflict of interest.

Initially, Sangermano was opposed to the Village hiring Celona. Indict. ¶ 26. After being advised by Urciuoli that Roger Williams Realty would be responsible for paying Celona's salary, Sangermano agreed to have the Village enter into a consulting agreement with Celona. Id. ¶ 27. The stated objective of Celona's job was "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at" the Village and Elmhurst Extended Care. Id. ¶¶ 24, 25. Thereafter, Celona commenced working for RWMC and the Village and reporting to Driscoll. Id. ¶ 28.

Defendants' deception included, but was not limited to, obtaining a Rhode Island Ethics Commission opinion based on false and misleading information. Id. ¶¶ 41-44, 102. The Indictment details how Defendants Urciuoli and Driscoll sent an April 6, 1998, letter to the Ethics Commission[6] stating that Celona was employed by the Village to promote services provided to senior citizens. Attached to the Ethics Commission letter was also a copy of the Consulting Agreement, which stated that Celona was being hired by the Village to "heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available" at the Village and Elmhurst Extended Care. Id. ¶¶ 12, 24-25. In the April 6, 1998, letter, Defendants Urciuoli and Driscoll failed to disclose that Celona had been performing political services for RWMC, reporting to Driscoll, and that RWMC was funding the Village's payments to Celona. Id. ¶ 44. Thus, Defendants' letter to the Ethics Commission wholly misrepresented the true identity of Celona's employer and the true nature of the work he was and would be performing. Id. ¶ 44.

From on or about February 28, 1998, to December 31, 2003, Celona continued to submit invoices for his services, by mail, to the Village. Id. ¶ 31. In all, Defendants Urciuoli, Driscoll, and Sangermano caused the Village to provide 72 checks to Celona, by mail, totaling

---

[6] The Rhode Island Ethics Commission was an independent commission created by the State of Rhode Island. Indict. ¶ 11. The Ethics Commission was charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island General Assembly enacted the Rhode Island Code of Ethics in Government. The Ethics Commission had the authority to investigate violations of the Code of Ethics and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to the requirements under the Code of Ethics. As an elected State official, Celona was subject to the Code of Ethics. Id.

approximately $260,638.63, which money was disguised as payments by the Village for services as a consultant on elderly affairs. Indict. ¶ 32.

Over the approximately six years that the consulting agreement was in place, Defendants Urciuoli, Driscoll, and Sangermano directed Celona to use his "influence, power and authority" to take official actions which benefitted RWMC and its affiliates. Id. 14, 19. The Indictment details numerous official actions Celona undertook at Defendant Urciuoli and Driscoll's behest, including but not limited to opposing Cancer Council legislation, id. ¶¶ 54-60, Payment in Lieu of Taxes legislation, id. 61-64, bone marrow legislation, id. ¶¶ 65-67, and influencing individuals and corporations doing business with RWMC in a manner intended to financially benefit RWMC, id. ¶¶ 19(d), 73-86, 87-91.

The Indictment also details official actions with which Sangermano tasked Celona. For example, despite the stated objective in the Consulting Agreement that Celona's job was "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at the Village and Elmhurst Extended Care, in or about February of 1998, Driscoll and Sangermano directed Celona to work to "defeat" Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities," which would prohibit health facilities (such as the Village) from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. Such an Act, if enacted into law, would have had a negative impact on the finances of the Village in that the Village would not be allowed to offer Alzheimer's care to patients without being licensed as a nursing home or hospital. Id. ¶ 33. As a result of Driscoll and Sangermano's direction, in or about February of 1998, a date prior to the submission of the Ethics Commission letter, Celona

discussed Senate Bill 98-H 8229 with other legislators and advocated that the legislation be "held," which effectively prevented the legislation from advancing. Id. ¶ 34.

On or about March 23, 1999, during the same time period that Celona was being paid by the Village with monies provided by Roger Williams Realty, and in spite of Celona's stated job description contained in the Consulting Agreement, Sangermano asked Celona to have a Representative and a Senator sponsor a bill amending the extension of the moratorium on licensing new nursing home beds, House Bill 99-H 6122. Indict. ¶ 50. Such an amendment was expected to have a positive impact on the finances of the Village. Sangermano provided Celona with a proposed amendment to the legislation. Id. Prior to acting on Sangermano's request, Celona checked with his boss, Driscoll. Id. ¶ 51. Thereafter, on or about November 6, 2000, Celona forwarded draft moratorium legislation to Sangermano in anticipation of Sangermano's meeting with another legislator. Id. ¶ 52. Also pursuant to Sangermano's request and also with Driscoll's approval, from on or about March 23, 1999, to on or about February 14, 2001, Celona provided political assistance and obtained legislative sponsors for an amendment to the moratorium legislation. Id. ¶ 53.

Over time, Defendants rewarded Celona for his efforts, increasing his original weekly salary from $700 to $1,000. Id. ¶¶ 92-94. For example, on or about October 16, 2000, Sangermano sent Celona a letter enclosing two copies of the Consulting Agreement between Celona and the Village, already signed by Sangermano, increasing Celona's weekly salary from $700.00 to $892.31 per week. Id. ¶ 93. In Sangermano's letter to Celona, he asked Celona to sign the copies of the Consulting Agreement and return them to Sangermano's attention. Sangermano did not amend the description of Celona's duties in the Consulting Agreement in

order to reflect the true nature of Celona's relationship with RWMC, nor did he direct his staff to amend the information provided to the Ethics Commission to reflect the true nature of Celona's relationship with the Village at Elmhurst. Id.

## III. Argument

### A. The Court's Review of the Indictment is Limited to the Four Corners of the Document

As argued more thoroughly in the United States' Memorandum in Support of its Objection to Urciuoli's motion to dismiss, the Court's review of the sufficiency of the allegations in the Indictment is limited to the four corners of the Indictment and should not include consideration of the evidentiary materials submitted by Urciuoli and relied upon by Sangermano. See Sampson, 371 U.S. at 78-79; United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994).

### B. Sufficiency of the Indictment Standard

Rule 7(c)(1) of the Federal Rules of Criminal Procedure mandates that an indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." An indictment is legally sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and . . . enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). "An indictment is generally sufficient if it sets forth the offense in the words of the statute including all the elements." United States v. Holmes, 632 F.2d 167, 169 (1st Cir. 1980). The Indictment's allegations against Sangermano meet this standard.

**C. Motion to Dismiss Standard**

As articulated more fully in the United States' response to Urciouli's motion to dismiss, an indictment's validity is tested solely by its allegations, not by whether the United States can prove its case at trial. See Costello v. United States, 350 U.S. 359, 363-64 (1956). In addition, resolution of any factual issues underlying Sangermano's motion must wait until trial. See United States v. Triumph Capital Group, 260 F. Supp.2d 444, 448 (D. Ct. 2002) ( "[A] technically sufficient indictment is not subject to dismissal on the basis of factual questions, the resolution of which must await trial.")(quotations omitted). Thus, because Sangermano's motion rests on his contention that the United States will be unable to prove its case against him at trial, and raises factual disputes about key issues, his motion should be denied.

**D. Honest Services Mail Fraud**

To establish a violation of 18 U.S.C. § 1341, the government must prove two elements: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails in furtherance of the scheme to defraud. United States v. Sawyer, 239 F.3d 31, 39-40 (1st Cir. 2001) ("Sawyer II"). With respect to the first element, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346, and therefore § 1341, "reach[es] schemes to defraud individuals of the intangible right to honest services of government officials." United States v. Sawyer , 85 F.3d 713, 723-24 (1st Cir. 1996) ("Sawyer I") (citing United States v. Grandmaison, 77 F.3d 555, 565-66 (1st Cir. 1996)). Because the Indictment here alleges such a scheme, with respect to the first element, the United States must prove that Defendants "acted with two kinds of intent: that [they]

intended to deprive the public of [a public official's] honest services, and that [they] intended to deceive the public." Sawyer II, 239 F.3d at 41. The "first kind of intent" requires either that Defendants "intended to influence [a public official] in [his or her] official action" or that they intended that the official fail to disclose a conflict of interest resulting in personal gain Id. at 40-41.

The United States may demonstrate an intent to influence a public official in his official action in several ways. "For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, . . . a person with continuing and long-term interest before an official might engage in a pattern of repeated intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services." Id. at 41.

The Indictment, which charges conspiracy to commit honest services mail fraud in Count 1, and honest services mail fraud, Counts 2-38, alleges all that §§ 1341 and 1346 require. See e.g. Indict. ¶¶ 14-16, 97-98, 105.

For example, Paragraph 96 of the Indictment avers:

> The Grand Jury further charges that from in or about August 1997, through in or about December 2003, Defendants URCIUOLI, DRISCOLL, and SANGERMANO, knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

See also Indict. ¶ 14. Paragraphs 97 and 98 allege that the two objects of the scheme were to "influence and affect" Celona's official actions and to deceive the State of Rhode Island and its

citizens concerning RWMC's relationship with Celona.

> 97. It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, appointment power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates from which Celona was receiving money.
>
> 98. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates from which Celona was receiving money.

See also Indict. ¶¶ 15, 16. The Indictment, tracking the language of §1341, also alleges that Defendants, including Sangermano, "for the purpose of executing the scheme and artifice to defraud" . . . "knowingly and willfully cause[d] to be placed in an unauthorized depository for mail matter" checks to Celona, "to be sent and delivered by the United States Postal Service." See ¶¶ 104, 107, Counts 2-38. On its face then, the Indictment properly and sufficiently pleads its mail fraud counts against Sangermano. It alleges all of the elements of 18 U.S.C. §§ 1341 and 1346. It describes the nature of the scheme to defraud, the intent with which the scheme was devised, and the mail communications sent in furtherance of scheme. Accordingly, Sangermano's motion should be denied.

### E. The Allegations in the Indictment Squarely Allege that Defendant Sangermano Intended to Deceive the Public

Sangermano, relying primarily on the arguments Urciuoli puts forth in his motion to dismiss, and evidentiary materials not properly considered in ruling on a motion to dismiss, contends that the State of Rhode Island and its citizens had full disclosure of the facts concerning John Celona's work relationship with RWMC. In response to Sangermano's motion, the United

States respectfully refers the Court to its arguments in opposition to Urciuoli's motion and incorporates them by reference.

Moreover, Sangermano overlooks that the Indictment specifically alleges that he intended to deceive the State of Rhode Island and its citizens. Paragraphs 100 and 102 of the Indictment state the following:

> 100. It was further part of the scheme that defendants URCIUOLI, DRISCOLL, and SANGERMANO, along with Celona knowingly and willingly failed to disclose to the public that Celona had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that Celona obtained money from RWMC in exchange for his political support.
>
> * * * * *
>
> 102. It was further part of the scheme that URCIUOLI, DRISCOLL, SANGERMANO, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things:
>
> a. disguising the nature of Celona's relationship with RWMC by having the Village hire and pay Celona;
>
> b. failing to disclose Celona's conflict of interest, including to the Ethics Commission;
>
> c. providing false and misleading information to the Ethics Commission;
>
> d. seeking an advisory opinion from the Ethics Commission based on false, misleading, and incomplete information.

Moreover, paragraph 25 of the Indictment specifically avers that:

> On various dates, from on or about October 15, 1997, to on or about July 22, 1998, URCIUOLI, DRISCOLL and SANGERMANO caused the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported be a consulting agreement between Celona and the Village which stated that "[t]he management of the Village at Elmhurst wishes to engage you, John Celona (the "Consultant") to provide the following services on behalf of

> the Village of Elmhurst and Elmhurst Extended Care ("Elmhurst")," when URCIUOLI, DRISCOLL and SANGERMANO all knew that the true nature of the employment agreement was for Celona to perform duties for RWMC and to report to DRISCOLL.

Sangermano objects, however, to the fact that the Indictment does not allege his contributions to the drafting process or "explain" how he could have known the "true nature" of the agreement. Quite simply, the Indictment does not have to.

Nevertheless, it does. For example, by July 22, 1998, the date averred in the Indictment as the last date on which the Consulting Agreement was being falsely and fraudulently revised, Sangermano had already directed Celona to work to defeat Senate Bill 98-H-8229, a bill which would "prohibit health facilities (such as the Village) from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals" and would have had a negative financial impact on the Village. Indict. ¶ 33. Celona's actions on Senate Bill 98-H-8229 fell outside the objective of his position as stated in the Consulting Agreement -- a fact which Sangermano, who the Indictment alleges was involved in the drafting of the Consulting Agreement and signed the Agreement, would have known. Indict. ¶¶ 24-25.

Moreover, in October 2000, when the Indictment alleges Sangermano sent Celona two signed copies of the Consulting Agreement increasing Celona's salary from $700 to $892 per week, Sangermano took no steps to revise the Agreement to reflect the true nature of Celona's duties. By that time, Sangermano had already enlisted Celona's assistance in getting a bill sponsored which would have extended the moratorium on the licensing of new nursing home beds, legislation which would have had a positive impact on the Village's finances. Indict. ¶ 50.

### F. The Indictment Charges Sangermano as an Aider and Abettor

In arguing that the allegations in the Indictment against him are lacking, Sangermano also ignores that the Indictment charges him as an aider an abettor.[7] See Indict. ¶ 107, Counts 3-38 (All in violation of 18 U.S.C.§§ 2, 1341, 1346.) . "An aider and abettor need not know every last detail of the substantive offense, but he must share in the principal's criminal intent." United States v. Sanborn, 563 F.2d 488, 491 (1st Cir. 1977) (citations omitted). The Indictment alleges that Sangermano intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their right to John Celona's honest services and that he deceived the State of Rhode Island and its citizens concerning Celona's relationship with RWMC. See Indict. ¶¶ 96, 101, 102. The fact that the Indictment does not allege Sangermano's participation in every aspect of the scheme is of no matter. See Coffin v. United States, 156 U.S. 432, 448 (1895) (indictment need not state how defendant aided and abetted the commission of the offense).

Furthermore, Sangermano ventures to suggest that one of the United States' theories of his criminal liability for honest services mail fraud might be that he "recklessly disregarded that Celona was in fact carrying on improper lobbying efforts on behalf of RWMC and was remunerated therefore by RWMC through the sham Consulting Agreement." Sangermano's Mem. in Supp. of Mot to Dismiss (hereinafter "Supp. Mem.") at 13. Sangermano contends, however, that because in order to be convicted of honest services mail fraud the jury must find

---

[7] As the Court is aware, 18 U.S.C. § 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

that he acted knowingly, the United States' reckless indifference theory fails. He is mistaken.

Reckless indifference alone can support a mail fraud conviction. See United States v. Gay, 967 F.2d 322, 326 (9th Cir. 1992). At trial, Sangermano may also be found criminally liable if he consciously avoided knowledge that the terms of the Consulting Agreement, and the actions of his codefendants, were false and misleading. See United States v. Brien, 617 F.2d 299, 312 (1st Cir. 1980) ("Since we equate the term conscious avoidance with a specific intent to avoid knowing whether one's statements are false and misleading, conscious avoidance is merely a subset of specific intent."). "If, by [avoiding the proscription of the law by not determining the accuracy of one's statements] one participates in a scheme to defraud, that person is as guilty of violating the mail fraud statutes as a person who is conscious of the nature of his statements." Id. Accordingly, under any of the theories espoused above, the Indictment pleads sufficient facts that Sangermano "knowingly devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment." Indict. ¶ 96. Accordingly, Sangermano's motion to dismiss should be denied.

### G. Celona's Work on Behalf of RWMC Was Not "Approved" by the Ethics Commission

Sangermano also incorporates Urciuoli's argument that Defendants could not have deprived the public of its right to John Celona's honest services because the actions which the Indictment alleges Celona undertook at Defendants' behest conformed with the permissible activities outlined in the Ethics Commission opinion. Similarly, the United States incorporates

the arguments it puts forth in its memorandum in support of its objection to Urciuoli's motion in responding to Sangermano's motion on this point.

### H. The Indictment Sufficiently Alleges a Scheme to Defraud Under 18 U.S.C. § 1346

Sangermano further incorporates Urciuoli's argument that the Indictment does not allege a scheme to defraud under § 1346. Again, in opposing Sangermano's motion, the United States incorporates the arguments it puts forth in its memorandum in support of its objection to Urciuoli's motion on this issue.

## IV. Conclusion

Based upon the foregoing, the United States respectfully requests that the Court deny Defendant Sangermano's Motion to Dismiss the Indictment.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

Dated: April 17, 2006

LUIS M. MATOS
DULCE DONOVAN
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April, 2006, I caused to be sent by first class regular mail a true copy of the within United States' Memorandum in Support of Its Objection to Defendant Sangermano's Motion to Dismiss the Indictment to:

Richard M. Egbert, Esq.
99 Summer Street
Suite 1800
Boston, MA 02110

Kevin J. Bristow, Esq.
501 Turks Head Building
Providence, RI 02903

John A. Pappolardo, Esq.
James P. Redding, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110

Michael J. Connolly
Hinckley Allen Snyder LLP
28 State Street
Boston, MA 02109