**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-02-01-T** |
| **ROBERT A. URCIUOLI,** **FRANCES P. DRISCOLL, and** **PETER J. SANGERMANO, JR.** | ) | |

**DEFENDANT PETER J. SANGERMANO, JR.'S**
**PRETRIAL MEMORANDUM**

Pursuant to this Court's Pretrial Order of August 4, 2006, defendant Peter J. Sangermano, Jr. ("Sangermano") respectfully submits this Pretrial Memorandum. Set forth below are: the issues, both legal and factual, that will be presented at trial; a statement of Sangermano's positions regarding each claim against him; a list of the pending matters that should be considered by the Court prior to trial; an estimate of the time required to present Sangermano's defense and to litigate the entire case; and a list of questions that counsel for Sangermano requests the Court to ask of prospective jurors during the *voir dire* examination.

## I. ISSUES TO BE PRESENTED AT TRIAL

Set forth below is a list of issues, both legal and factual, that will be presented at trial.

1. Whether a conspiracy to commit an offense against the United States, specifically a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of State Senator John A. Celona ("Celona") and to have those services performed free from deceit, favoritism, bias, conflict of

interest and self-enrichment, as alleged in Counts 1-38 of the Indictment, in violation of 18 U.S.C. §§ 2 and 1346 as alleged in Count 1 of the Indictment, in violation of 18 U.S.C. § 371, existed. See Indictment, dated January 5, 2006, at ¶¶ 14, 96 and 106.

2. Whether Sangermano had knowledge that said conspiracy to commit an offense against the United States, as alleged in Count 1 of the Indictment, in violation of 18 U.S.C. § 371, existed. See id.

3. Whether Sangermano knowingly, willfully, and unlawfully participated in said conspiracy to commit an offense against the United States, as alleged in Count 1 of the Indictment, in violation of 18 U.S.C. § 371. See id. at ¶ 14.

4. Whether Sangermano, Robert A. Urciuoli, ("Urciuoli") or Frances P. Driscoll's ("Driscoll") committed any overt acts in an effort to further an agreement to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of State Senator Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment. See id. at ¶¶ 21-94.

5. Whether Sangermano, along with Urciuoli and Driscoll, on various dates from on or about October 15, 1997, through and including July 22, 1998, caused the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported to be a consulting agreement between Celona and the Village at Elmhurst. See id. at ¶ 25.

6. Whether Sangermano provided false or misleading information to the Rhode Island Ethics Commission. See id. at ¶¶ 20 and 102.

7. Whether in or about February, 1998, Sangermano, along with Driscoll, directed Celona to work to defeat House Bill 98-H 8229. See id. at ¶ 33.

8. Whether on or about March 23, 1999, Sangermano asked Celona to have a Rhode Island State Senator and a State Representative sponsor a bill amending the extension of a moratorium on nursing home beds. See id. at ¶ 50.

9. Whether from on or about March 23, 1999 to on or about February 14, 2001, Celona provided political assistance and obtained sponsors for an amendment to the moratorium legislation, at Sangermano's request. See id. at ¶ 53.

10. Whether from in or about August 1997, through in or about January 8, 2004, Sangermano devised and/or intended to devise a scheme to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of State Senator Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment. See id. at ¶¶ 14, 96 and 106.

11. Whether Sangermano intended to assist in the alleged scheme or artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of State Senator Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment. See id.

12. Whether the United States mail was used in furtherance of a scheme or artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of State Senator Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment. See id. at ¶¶ 104 and 107.

13. Whether Sangermano intended to enter into an agreement to pay money to Celona so as to improperly influence and affect the official actions of Celona. See id. at ¶¶ 15 and 97.

14. Whether Sangermano intended to enter into an agreement to pay money to Celona to cause Celona to use his power, influence, and authority as a State Senator to benefit the political and financial interests of Roger Williams Medical Center ("RWMC") and its affiliates. See id.

15. Whether Sangermano intended to participate in a scheme or artifice to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates. See id. at ¶¶ 16 and 98.

16. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, caused the Village at Elmurst to enter into a consulting agreement with Celona in order to provide him with money in exchange for his political support, including support for matters in which RWMC and the Village at Elmhurst had an interest, which were pending before the Rhode Island General Assembly and the Senate Corporations Committee. See id. at ¶¶ 17 and 99.

17. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, knowingly and willfully failed to disclose to the public that Celona had an improper conflict of interest, and whether any such alleged conflict of interest deprived the State of Rhode Island and its citizens of their intangible right to honest services. See id. at ¶¶ 18 and 100.

18. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to influence and affect Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefited RWMC and its affiliates. See id. at ¶¶ 19 and 101.

19. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to influence and affect Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee by directing Celona to use his influence, power and authority to take official actions and refrain from taking official actions all to benefit RWMC and its affiliates. See id.

20. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to influence and affect Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee by directing Celona to use his influence, power and authority to influence other legislators to act or fail to act in such a way as to benefit RWMC and its affiliates. See id.

21. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to influence and affect Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee by directing Celona to use his influence, power and authority to provide information, acquired in the course of and by reason of his official duties, to RWMC and its affiliates. See id.

22. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to influence and affect Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee by directing Celona to use his influence, power and authority to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates. See id.

23. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to deceive the State of Rhode Island and its citizens concerning Celona's

relationship with RWMC and its affiliates by disguising the nature of Celona's relationship with RWMC by having the Village at Elmhurst hire and pay Celona. See id. at ¶¶ 20 and 102.

24. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC and its affiliates by failing to disclose Celona's alleged conflict of interest, including to the Ethics Commission. See id.

25. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC and its affiliates by providing false and misleading information to the Ethics Commission. See id.

26. Whether Sangermano, along with RWMC, Urciuoli and Driscoll, conspired to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC and its affiliates by seeking an advisory opinion from the Ethics Commission based upon false, misleading, and incomplete information. See id.

27. Whether Sangermano had any knowledge, at the time he entered into the consulting agreement with Celona, that Celona would perform duties for RWMC and report to Driscoll. See id. at ¶ 25.

28. Whether Senate Bill 98-H 8229 would have had a negative impact on the finances of the Village at Elmhurst had the bill been enacted into law. See id. at ¶ 33.

29. Whether an amendment extending the moratorium on licensing new nursing home beds would have had a positive impact on the finances of the Village at Elmhurst. See id. at ¶ 50.

30. Whether, on or about November 6, 2000, Sangermano received draft moratorium legislation from Celona. See id. at ¶ 52.

31. Whether, on or about May 4, 2000, in the District of Rhode Island, Driscoll, for the purpose of executing a scheme or artifice to defraud the State of Rhode Island and its citizens of the honest services of State Senator Celona, knowingly and willfully caused to be placed in an authorized depository for mail matter a check, No. 1054, drawn from the Village at Elmhurst's Capital Account and made payable to Celona, in the amount of $2,800, for consulting fees for the month of April, 2004, to be sent and delivered by the United States Postal Service. See id. at ¶ 104.

32. Whether, on or about the dates indicated in Paragraph 107 of the Indictment, in the District of Rhode Island, Sangermano, Urciuoli and/or RWMC, for the purpose of executing a scheme or artifice to defraud the State of Rhode Island and its citizens of the honest services of State Senator Celona, knowingly and willfully caused to be placed in an authorized depository for mail matter checks, drawn from the Village at Elmhurst's Capital Account and made payable to Celona, in the amounts stated in Paragraph 107 of the Indictment, to be sent and delivered by the United States Postal Service. See id. at ¶ 107.

33. Whether, as the government has contended, negligence or recklessness constitutes legally sufficient intent for criminal liability in connection with the alleged mail and wire fraud violations.

34. Subject to the government's undisclosed determination as to whether or not to seek to introduce at trial any recorded testimony of co-defendants incriminatory of

Sangermano, a determination as to whether said testimony must be modified, excluded, require the severance of trials, or otherwise addressed, may be necessary.

**II. SANGERMANO'S POSITION**

Defendant Sangermano's position regarding the claims brought against him by the United States of America is as follows:

1. As to Count 1: At no time did Sangermano enter into, participate in, or have knowledge of the existence of an alleged conspiracy to deprive the State of Rhode Island and its citizens of the honest services of State Senator Celona, nor did Sangermano commit any over acts further to same. The Village at Elmhurst, owned by the Roger Williams Realty Corp. ("RWRC") and SANAT, entered into a consulting agreement with Celona at the request of RWRC for purposes of marketing and community outreach for the Village at Elmhurst. Pursuant to the Village at Elmhurst's management agreement, Sangermano was the authorized signatory for the Village at Elmhurst's contracts. SANAT agreed to the retention of Celona as an independent contractor consultant for the Village of Elmhurst only after approval and advice of counsel as to same, the issuance of an advisory opinion by the Rhode Island Ethics Commission relating to the consulting relationship, and modifications to the operating agreement pursuant to which it was expressly stated that Celona was being retained at RWRC's request, and that RWRC would provide indemnification for costs relating thereto, and that the consulting fees for Celona's services would be paid out of RWRC's profits from the Village at Elmhurst. The Village at Elmhurst's consulting agreement with Celona was prominently reported in the media, and there was no effort by Sangermano to conceal this public fact.

At no time did Sangermano have knowledge, nor did Sangermano have reason to know or suspect, that Celona was engaging in any improper activities on behalf of RWMC or RWRC as the result of directives received from Urciuoli, Driscoll, or anyone else.

Sangermano at all times herein acted in good faith, in reasonable reliance on the advice of his counsel and on representations made by counsel for, and employees and representatives of, RWMC and RWRC, and without the specific intent to defraud and deceive to enter into or participate in an agreement to deprive the State of Rhode Island and its citizens of the honest services of State Senator Celona.[1] Sangermano did not, on various dates from on or about October 15, 1997, through and including July 22, 1998, cause the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported to be a consulting agreement between Celona and the Village at Elmhurst. Sangermano did not provide false or misleading information to the Rhode Island Ethics Commission.

Sangermano did not, in or about February, 1998 direct Celona to work to defeat House Bill 98-H 8229, nor did he request and receive from Celona from on or about March 23, 1999 to on or about February 14, 2001, improper political assistance for an amendment to the moratorium legislation.

2. As to Counts 2 through 38: At no time did Sangermano devise, participate in, or have knowledge of a scheme or artifice to deprive the State of Rhode Island and its citizens of the honest services of State Senator Celona. At all relevant times herein, Sangermano acted in good faith, and without the specific intent to defraud

---

[1] United States v. Sawyer, 239 F.3d 31, 41 (1st Cir. 2001); United States v. Woodward, 149 F.3d 46 (1st Cir. 1998); United States v. Sawyer, 85 F.3d 713, 729 (1st Cir. 1996), copies of which are attached hereto.

and deceive. As recounted above, SANAT only assented to the retention of Celona at RWRC's request after it had taken reasonable steps, through counsel, to ensure the legality and propriety of the consulting agreement.

Sangermano did not, on various dates from on or about October 15, 1997, through and including July 22, 1998, cause the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported to be a consulting agreement between Celona and the Village at Elmhurst. Neither did Sangermano provide false or misleading information to the Rhode Island Ethics Commission.

At no time did Sangermano have any knowledge, nor did Sangermano have reason to suspect, that Celona was engaging in any improper activities on behalf of RWMC or RWRC as the result of directives received from Urciuoli, Driscoll, or anyone else. The interactions between Sangermano and Celona were extremely limited and almost exclusively pertained to Celona's marketing efforts on behalf of the Village at Elmhurst. The only instances in which Sangermano, or any individuals acting on Sangermano's behalf in connection with the management of the Village at Elmhurst, dealt with Celona in a non-marketing posture entailed requests for Celona to perform purely ministerial, non-legislative tasks, such as requests to colleagues to serve as sponsors for a proposed amendment to a piece of legislation.[2] In such instances, Celona recused himself from the deliberation and voting on said legislation.

In sum, Sangermano at all times herein acted in good faith, in reasonable reliance on the advice of his counsel and on representations made by counsel for, and employees

---

[2] Rules of the Rhode Island Senate, § 4, Rules 4.4 & 4.5; Rules of the Rhode Island House of Representatives, Rules 5(b) & 31(g)(i), copies of which are attached hereto.

and representatives of, RWMC and RWRC. Sangermano lacked the intent required for the commission of any of the crimes alleged in the Indictment.

## III. PENDING MATTERS

The following motions are pending before the Court and must be resolved prior to trial:

### A. Motions in Limine

No motions in limine are pending at present, but it is anticipated that need for such motions may arise in connection with the government's presentation of its case.

### B. Other Motions

1. Motion to Sever: Defendant Sangermano renews his previously filed Motion to Sever, and subject to further disclosures of the government, reserves his right to submit supplemental briefing in support thereof. As grounds therefor, Sangermano states that testimony of co-defendant Urciuoli, inadmissible against but incriminatory of Sangermano, may be proffered by the government at trial, and thus a potential Bruton[3] problem exists. Because Urciuoli's testimony so plainly and unavoidably points to Sangermano, mere redaction of the latter's name would not resolve this Bruton problem.[4] As further grounds, Sangermano states that he and Urciuoli, if jointly tried, would present antagonistic defenses so irreconcilable as to prevent a jury from rendering a reliable judgment as to guilt or innocence.[5]

---

[3] Bruton v. United States, 391 U.S. 123 (1968), a copy which is attached hereto.

[4] Grey v. Maryland, 523 U.S. 185 (1998); United States v. Vega Molina, 407 F.3d 511 (1st Cir. 2005), copies of which are attached hereto.

[5] United States v. Pẽna-Lora, 225 F.3d 17 (1st Cir. 2000); United States v. Woods, 210 F.3d 70 (1st Cir. 2000); United States v. Talavera, 668 F.2d 625 (1st Cir. 1982); United States v. Ayala Lopez, 319 F. Supp.2d 236 (D.P.R. 2004), copies of which are attached hereto.

2. Motion to Strike: Defendant Robert A. Urciuoli's Motion to Strike the Words "Favoritism" and "Bias" from the Indictment and for Other Relief.

## IV. ESTIMATE OF TIME NEEDED FOR TRIAL

### A. Time Needed to Present Sangermano's Defense

Sangermano respectfully requests five (5) days to present his defense.

### B. Time Needed to Litigate the Entire Case

Based upon the government's previous representation that it will take six (6) weeks to present its case, coupled with both Sangermano's and his co-defendants' presentation of their defenses, it is possible that nine (9) weeks will be required to litigate the matter in its entirety.

## V. QUESTIONS FOR PROSPECTIVE JURORS

Sangermano respectfully requests that the following questions be asked of prospective jurors:

1. Have you, or someone close to you, ever considered working or applied for work in law enforcement or as a government lawyer or prosecutor? If so, describe.

2. Do you have an opinion about the truthfulness of the government or its agents? If so, describe.

3. Do you feel that if the government charges someone with a crime, it is more likely than not that the person committed the crime? If so, why do you feel this way?

4. If one or more of the defendants in this case did not take the stand to provide their side of the story, how would that make you feel?

5. Have you, or someone close to you, ever been the victim of a crime? If so, what was the offense, did it go to trial and did you or someone close to you testify?

6. Do you understand that all of the elements of a crime charged against a defendant must be proved beyond a reasonable doubt, and that if even one element is not proven beyond a reasonable doubt, you would then vote not guilty?

7. Do you understand that the government has the burden of proving each defendant guilty beyond a reasonable doubt separately, and that an accused person need not introduce any evidence whatsoever?

8. Are you, or anyone close to you, a member of any social, civic, fraternal, business, religious or political organizations? If so, describe, including offices held, if any.

9. Do you regularly read any newspapers, magazines or websites? If so, which ones?

10. Do you regularly listen to any radio talk programs? If so, which ones?

11. Do you regularly watch any television programs? If so, which ones?

12. Do you know who the Rhode Island State Senators and Representatives for your area are?

13. Do you know if you were ever represented by Rhode Island State Senator John Celona?

14. Have you, or anyone close to you, ever held, run for, or considered running for public office? If so, describe.

15. Have you, or anyone close to you, worked or volunteered for or on behalf of any candidate for public office? If so, describe.

16. Have you, or anyone close to you, worked or volunteered for or on behalf of any one holding public office? If so, describe.

17. How do you feel about elected public officials?

18. Have you, or anyone close to you, held a position in which there are ethical or other rules governing potential conflicts of interest? If so, describe.

19. Have you, or anyone close to you, worked or volunteered for a lobbying or interest group? If so, describe.

20. Have you, or anyone close to you, held a position in a regulated industry or profession? If so, describe.

21. Have you, or anyone close to you, owned your own business? If so, describe.

22. Have you, or anyone close to you, ever worked for a large corporation? If so, describe your experience and/or your feelings about such organizations.

23. Do you have an opinion about the truthfulness of large corporations and the people who work in them? If so, describe.

24. Have you ever heard of the Enron, Worldcom, or Global Crossing business situations? If so, what impact, if any, have these situations had on the way you view large corporations and the people who work in them.

25. Have you, or anyone close to you, resided at or considered residing at a retirement home or assisted living facility? If so, describe.

26. Have you, or anyone close to you, had any experience of any kind with retirement homes or assisted living facilities? If so, describe.

27. Describe your feelings, if any, about the health care industry, in general.

28. Describe your feelings, if any, about the assisted living and retirement home industry.

29. Have you had any experiences with the assisted living facilities and retirement home industry that might interfere with your ability to serve as an impartial juror in this case?

30. Have you, or anyone close to you, ever been accused of committing a crime? If so, describe.

31. Have any of you had any experiences, or do any of you hold any opinions, that you feel the Court, the prosecution or the defense should know about?

Respectfully submitted,

PETER J. SANGERMANO, JR.,
By his attorneys,

____/s/ Evan Georgopoulos______
James P. Redding (Bar No. 2976)
A. John Pappalardo
Evan Georgopoulos
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
(617) 310-6000
reddingj@gtlaw.com
pappalardoj@gtlaw.com
georgopoulose@gtlaw.com

Dated: August 30, 2006

**CERTIFICATION**

I hereby certify that on August 30, 2006 a copy of the foregoing Defendant Peter J. Sangermano, Jr.'s Pretrial Memorandum was electronically filed and served by mail upon counsel unable to accept electronic filing. Notice of this filing shall be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

____/s/ Evan Georgopoulos______
Evan Georgopoulos