UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| VS. | : | CR 06-02-01-T |
| | : | |
| ROBERT A. URCIUOLI, | : | |
| FRANCES P. DRISCOLL, | : | |
| PETER J. SANGERMANO, JR., and | : | |
| ROGER WILLIAMS MEDICAL CENTER | : | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE INDICTMENT DUE TO PROSECUTORIAL MISCONDUCT AND FOR OTHER RELIEF**

NOW COME Defendants Robert A. Urciuoli ("Urciuoli"), Frances P. Driscoll ("Driscoll") and Peter J. Sangermano ("Sangermano") (collectively, the "Defendants") and respectfully submit this Supplemental Memorandum of Law in Support of their Motion to Dismiss the Indictment Due to Prosecutorial Misconduct and For Other Relief. In the alternative to dismissal, the Defendants respectfully request that the Court otherwise sanction the Government by instructing the jury that the Government withheld constitutionally-required exculpatory evidence in violation of the Court's orders, and that the jury may draw an adverse inference against the Government from this misconduct.

On September 6, 2006, this Court permitted the Defendants to submit further evidence in support of their Motion to Dismiss the Indictment Due to Prosecutorial Misconduct. The Defendants wish to bring to the Court's attention newly-obtained evidence that confirms, unquestionably, what the Defendants have long suspected -- namely, that from the outset of its investigation, the Government engaged in a pattern of flagrant discovery abuses and prosecutorial misconduct designed to: withhold and conceal exculpatory information to which

the Defendants are constitutionally entitled, manipulate the evidence to conform to its theory of the case, and generally obstruct justice. The Government's outrageous misconduct warrants immediate dismissal of the Indictment or other extreme sanction by the Court. See United States v. Osorio, 929 F.2d 753 (1st Cir. 1991); United States v. Diabate, 90 F.Supp.2d 140, 144 (D. Mass. 2000); United States v. Pollock, 417 F. Supp. 1332, 1348 (D. Mass. 1976).

**RELEVANT FACTS**

On August 30, 2006, John Celona's attorney, William Dimitri ("Dimitri") appeared in court in connection with the pre-trial / discovery hearing. He brought his notes from his various meetings with Celona and the Government in connection with this investigation as well as the investigation into Celona's involvement with Blue Cross & Blue Shield ("BCBS") and CVS. Dimitri did not object to testifying on the grounds of attorney-client privilege.[1] On September 6, 2006, Dimitri produced these notes to the Defendants.

The day after the hearing, this Court ordered the Government to review all notes taken by agents during all interviews of Celona and to provide defense counsel with any Brady / Giglio material contained in those notes not later than 12:00 noon on Tuesday, September 5, 2006. See Order dated August 31, 2006.[2] The Court also ordered the Government to immediately provide defense counsel with unredacted copies of all 302s generated from interviews with John Celona and all of Celona's grand jury transcripts regarding this case and the "CVS / Blue Cross" investigation. Id.

---

[1] Undoubtedly, it became apparent to the Government at this point that the Defendants would obtain access to Attorney Dimitri's notes from his meetings with Celona and the Government.

[2] This was not the first time the Court ordered the Government to do so. On July 24, 2006 the Court ordered the Government to review notes of agents who interviewed Celona and interview those agents in order to determine whether Celona made any statements to agents that may constitute Brady material and that are not reflected in redacted 302s. See July 24, 2006 Order. The Order required the Government to produce any such material to the Defendants no later than August 2, 2006. The Government did not comply with this Order.

Following Dimitri's appearance and the Court's issuance of its August 31 Order, the Government produced additional evidence to the Defendants. This evidence consisted, in relevant part, of agents' notes dated September 13, 2004, an FBI 302 report of an interview of John Celona on March 15, 2005 and FBI 302 reports of Government meetings with Celona on September 3 and 4, 2006.[3] On September 6, 2006, Dimitri gave defense counsel his notes from his meetings with Celona and the Government. Dimitri produced notes from meetings with Celona and the Government on September 1, 2004, September 13, 2004, October 25, 2004, November 1, 2004, January 25, 2005, March 10, 2005 and May 6, 2005.

Dimitri's notes reveal what the Defendants have suspected all along, despite the Government's repeated and adamant representations to the contrary. A comparison of Dimitri's notes to the evidence produced by the Government reveals that the Government has intentionally and repeatedly concealed, altered, manipulated and delayed production of material, exculpatory information to which the Defendants are constitutionally entitled. More specifically, Dimitri's notes reveal that the Government has failed to disclose the evolution of Celona's testimony with respect to several key issues for trial, including the fact that Celona has made numerous inconsistent statements and has changed his position on and recollection of key events. Dimitri's notes reveal that Celona's waffling and, in some cases, his complete change of heart on key issues, were likely the result of Government conduct designed to intimidate Celona, threaten him with prosecution, make him second guess his own memory and motivate him to testify untruthfully. The evidence produced by the Government has revealed neither the various evolutions of Celona's testimony nor the scare tactics employed by the Government and its agents – in particular FBI Agent Dennis Aiken – in an effort to elicit testimony from Celona that

[3] The September 3 and 4 FBI 302 reports were produced on September 5, 2006.

supports its theory of the case. A detailed description of the newly-discovered discovery abuses follows.

**A. The Government Concealed Evidence reflecting that the Defendants Did Not Intend to Deceive the Public Concerning Celona's Ties to RWMC.**

Dimitri's notes reveal that the Government has concealed from the Defendants evidence reflecting that the Defendants and Celona did not believe that they were deceiving the public concerning Celona's ties to RWMC. According to Dimitri's notes from October 25 and 28, 2004, Celona made a number of extremely exculpatory statements reflecting that he and the Defendants did not intend to deceive the public concerning the nature of his relationship to RWMC and did not believe that they were violating the law. See Exhibit A.[4] These statements include, among other things, that:

> Celona thought the substance of the letter request from James McGuirk to the Ethics Commission for an Advisory Opinion was accurate at the time it was sent;
>
> In regard to setting up meetings between representatives from Blue Cross/Blue Shield and Roger Williams on reimbursement issues, he provided similar assistance to Fatima Hospital; and
>
> In response to the question: "What was Bob Urciuoli's most significant bill?", his reply was "None, really," or words to that effect.

Id.

Thereafter during the interview, Celona, in essence, denied that any crime had been committed. For example, he stated that:

> He and Roger Williams did not hide his connection to Roger Williams;
>
> He felt he could not vote on any bills specific to Roger Williams but he could vote if a bill was general as to all hospitals; and
>
> Although the Ethics Commission letter was factual when it was filed, things changed, but he never brought it up because it seemed to him not to be an issue since he never had a

[4] In recognition of the sensitive nature of the information contained in some of the exhibits, and in accordance with this Court's August 31, 2006 Order, Defendants have filed all exhibits under seal.

bill or vote specific to Roger Williams, and he had recused himself on any issues related to assisted living facilities.

When asked about reimbursement, Celona responded that the reimbursement issue between Roger Williams Hospital and Blue Cross did not involve legislation and was resolved without legislation. Id.

Taken collectively, these statements entirely undermine the Government's theory of prosecution. An honest services fraud case requires the Government to prove that the Defendants knowingly and willfully participated in a scheme to defraud the citizens of Rhode Island of John Celona's honest services. It must prove that the Defendants knew that they were committing a crime or violating the law and that the Defendants intended to influence Celona in his official action. Good faith is a complete defense. Celona's statements to the Government undermine the heart of the Government's case because they demonstrate that neither Celona nor the Defendants intended to deceive or defraud the public concerning Celona's relationship with RWMC or believed that they were breaking the law or committing a crime.

Shockingly, the FBI 302s produced by the Government and, in particular, John Celona's 302s, fail to show that Celona made even one of the plainly exculpatory statements described above. Further, the Government told defense counsel that such information does not exist in any federal prosecutors' or agents' investigative notes.

### B. The Government Provided Celona with Bias and Motivation to Lie and Change his Testimony.

Dimitri's notes clearly show that the Government has consistently intimidated, bullied, and manipulated Celona into giving testimony that conforms to its theory of the case. Government agents repeatedly "refresh[ed] his recollection" and forced him to "revisit" topics about which he had testified. Dimitri's notes also reveal that the Government routinely

memorialized in its reports only Celona's inculpatory "refreshed recollection" and not any exculpatory or inconsistent statements. Likewise, the reports make no reference of the threatening context in which Celona was forced to "revisit" certain topics.

For example, no doubt realizing that Dimitri was about to turn over his notes from Celona's March 10, 2005 interview, the Government produced on September 5, 2006 an FBI 302 report from that meeting. See Exhibit B. That report is 2 ½ pages long. Id. In striking contrast, Dimitri's notes from that same meeting are 15 pages long and reflect that the meeting lasted 3 ½ hours. See Exhibit C. Dimitri's notes also show that the Government began the meeting with blatant threats. Specifically, the Government warned Celona:

> That the Government had talked to some of the "coconspirators," and that some of the information that Celona had told the Government was "untrue;"
>
> That the agent wanted to "revisit some topics" and "refresh [Celona's] recollection;"
>
> That the agent believed that Celona conspired with others relative to BCBS, CVS and RWMC;
>
> That Celona and his alleged coconspirators were "walking dead men;"
>
> That the Government had "broken some of them;"
>
> That others were pointing the finger at Celona;
>
> That Celona was "looking at a war – not a battle;"
>
> That Celona needed to tell the truth if he wanted to "save [him]self;" and
>
> That this was Celona's last day to "straighten things out."

Id.

Indeed, the Government's admonishment of Celona consumes the first 2 pages of Dimitri's notes. Id. Despite Dimitri's unequivocal notes, the FBI 302 report contains no reference to any such threats. Moreover, the Government has never disclosed that it believed Celona's statements to be "untrue."

Similarly, Dimitri's September 9, 2004 notes reflect that FBI Agent Dennis Aiken told Celona that BCBS was "talking to CVS though emails," that BCBS "saves everything," that CVS and BCBS were "talk[ing] about [Celona]," and that "it [was] ugly." See Exhibit D (9/1/04, 9/7/04 and 9/9/04 notes). The evidence produced by the Government is devoid of reference to any such statements. Again, these statements appear nowhere in the documents produced by the Government to the Defendants.

**C. The Government Concealed Agents' Notes Reflecting that Celona Did Not Believe He Sold His Influence.**

Recently-obtained evidence reveals that the Government concealed yet even more exculpatory evidence. It was only recently, in the week before this trial started, that the Government acknowledged that Celona told the Government that he did not sell his influence as a legislator to the Defendants. Notably, the recently-produced notes are dated September 13, 2004. See Exhibit H. Among other things, these notes reveal that Celona made the following statements to the Government:

> "I don't believe I sold my office;" and
>
> I did not sell my vote or change position on any issue or take a position because of money I received."

Id., p. 4.

These statements undercut the very essence of the Government's honest services mail fraud case against the Defendants. That is, these statements show that the Defendants did not engage in a scheme to steal Celona's honest services from the citizens of Rhode Island. Undoubtedly, Celona's statements negate guilt and constitute critical impeachment evidence. They are clearly exculpatory, and they should have been produced to the Defendants long before

the eve of trial. Indeed, the Government's eleventh hour disclosure violates the Court's two previous Orders.

The agents' notes also reflect that, while Celona stated that there was a conflict of interest between him and CVS and an appearance of impropriety between him and BCBS, he said nothing about a conflict of interest with RWMC or the appearance of impropriety. See id. Again, these statements go to the essence of the Government's case. They are clearly exculpatory as they contradict the Government's theory of prosecution and provide fertile ground for impeaching Celona. Tellingly, this information was not provided to the Defendants until the Government knew that they would see Dimitri's notes from the same meeting.

**D. The Government Manipulated and Withheld Evidence Pertaining to the Initiation of Celona's Job.**

Dimitri's notes reveal that the Government withheld exculpatory information pertaining to the circumstances surrounding Celona asking Urciuoli for a job. The notes also strongly suggest that the Government, in recognition of the impending production of Dimitri's notes, "refreshed" Celona's recollection in an effort to diminish their exculpatory effect. Specifically, on September 5, 2006, the day before trial commenced, the Government produced an FBI 302 Report of a meeting on September 4, 2006 between Celona and Assistant U.S. Attorney Luis Matos and FBI Agent Dennis Aiken. The report states:

> That Celona approached Urciuoli at Café Nuovo in January 1997 (while Celona was having lunch with Senator Walton) and told Urciuoli that he wanted to meet with Urciuoli about the Hospital Conversion Act ("HCA"), which was then pending before the Rhode Island legislature and which Celona knew that Urciuoli and Roger Williams Medical Center ("RWMC") opposed;
>
> That Urciuoli agreed to a meeting and, thereafter, met with Celona between February and April of 1997 to talk about the HCA;
>
> That at this meeting Celona told Urciuoli that he would oppose the HCA and that when the HCA debate was over, he wanted a job with Roger Williams Hospital;

> That Urciuoli said to Celona, "Let's get through this first" (meaning the HCA debate that was pending before the legislature);
>
> That Celona stated that his primary reason for telling Urciuoli that he was opposed to HCA was to lay the groundwork for getting a job from Urciuoli;
>
> That Celona believed he was the primary point of contact between those Senators who opposed the HCA and Urciuoli, that he kept Urciuoli and co-defendant Fran Driscoll updated daily on the progress of aligning HCA votes; and
>
> That following the resolution of the HCA debate, Celona went to Urciuoli and said, "Bob, I did what I could (in opposing the HCA). You said to talk to you after the situation got through. I would like a position with the hospital."

See Celona FBI 302 Report dated 9/4/06, attached hereto as Exhibit E.

The September 4, 2006 302 report is completely inconsistent with evidence previously produced by the Government on the issue of Celona approaching Urciuoli about a job. The 302 report reflects the first time – in an investigation spanning over 2 years – that Celona ever indicated to anyone that he talked to Urciuoli about employment prior to the HCA debate being resolved. Indeed, in all of the other evidence produced by the Government, Celona indicates that he approached Urciuoli for a job after the HCA issue had been resolved. See 6/29/05 Grand Jury testimony of John Celona, pp. 52-54, attached hereto as Exhibit F; see also combined, partially-redacted Celona FBI 302, p. 28, attached hereto as Exhibit G. Records of Celona's grand jury testimony and proffer are devoid of any reference to Celona approaching Urciuoli prior to the resolution of the HCA debate and are inconsistent with the September 4 FBI 302.

Dimitri's notes from Celona's October 25, 2004 interview reference the very same encounter between Urciuoli and Celona at Café Nuovo in January 1997. See Exhibit A. However, Dimitri's notes tell a very different story of the encounter, as well as the circumstances surrounding Celona asking Urciuoli for a job. As Dimitri's notes document, Celona told the Government that he approached Urciuoli for a job after the HCA "battle" was over, not before.

Id. What is more, Dimitri's notes reflect that Celona made exculpatory statements to the Government that were not produced to the Defendants until the eve of trial: that when Celona approached Urciuoli about a job, Urciuoli said he would see what he could do but that he could not hire Celona unless he obtained an ethics opinion from the Rhode Island Ethics Commission. Id. This is clearly exculpatory information that was not reflected in any reports or other evidence produced by the Government prior to the eve of trial, despite the Government's obligations under Brady and Giglio and this Court's July 24, 2006 Order. Thus, not only did the Government withhold and conceal exculpatory evidence pertaining to the HCA (that was revealed after the disclosure of Dimitri's notes), but also it seemingly concocted new testimony in an effort to diminish the exculpatory effect of Dimitri's notes.

**E. The Government Manipulated and Concealed Evidence Pertaining to Celona's Statements and Memory About CRI Communications and BCBS.**

The Government likewise manipulated and concealed evidence pertaining to Celona's involvement with BCBS's television program with CRI Communications. On September 5, 2006, the Government produced to the Defendants -- for the first time -- an FBI 302 report of an interview with Celona on March 10, 2005. That report states:

> Celona stated that upon reflection, he now realizes that Catucci presented him first with a "Rhode Island Health Update" proposal with his name on the cover. Celona did not look at the proposal beyond the cover and he told Catucci to take his name off the cover as that would disclose a conflict of interest since BCBS appeared before Celona's Senate Corporations Committee regarding many legislative matters.

See Exhibit B, p. 1.

Dimitri also produced notes from that March 10, 2005 meeting. See Exhibit C. Comparing the FBI 302 report with Dimitri's notes from that very same meeting reveals that the Government's FBI 302 report is inaccurate, misleading and fails to reflect that Celona changed

his testimony only the Government's many threats. Specifically, Dimitri's notes state the following (all of which is glaringly absent from March 10 FBI 302 report):

> That the Government believed Celona had been untruthful;
>
> That the Government warned Celona that he had one last chance to "straighten things out;"
>
> That the Government knew that Celona's story about how the television show began was not true;
>
> That Catucci told the Government he had shown Celona the Rhode Island Health Update proposal with his name on it and Celona said to take his name off;
>
> That when asked by the Government agent if this was true, Celona answered, "I don't know – it may be;" and
>
> That Celona stated he had no independent recollection of telling Catucci to take his name off the proposal.

Id.

At a later point in the interview, Dimitri's notes document that Celona told the Government that he in fact told Catucci to take his name off of the proposal. Id. This statement represents a marked change in Celona's testimony, and followed the threats highlighted above. Nevertheless, the March 15, 2005 FBI 302 report states merely that "upon reflection," Celona realized that he had told Catucci to take his name off of the proposal. See Exhibit B, p. 1. The FBI 302 report is inaccurate, misleading and takes Celona's statement completely out of context; it utterly fails to acknowledge: (1) the threatening statements the Government made to Celona about not telling the truth; (2) that the Government told Celona that Catucci was telling them a different story; and (3) that Celona's statement was completely inconsistent with multiple statements that he made during the very same interview. To be sure, were it not for Dimitri's notes, the Defendants would have never known that Celona changed his position over time or that his change of heart came only after he was called a liar, told that others were giving different

information (which, upon information and belief, is not true), and was threatened with prosecution. Thus, Dimitri's notes reveal that the Government failed to disclose both the evolution of Celona's statements (including multiple earlier failures of memory) and that Celona changed his testimony after the Government's threats. This is clearly exculpatory impeachment evidence which the Government was constitutionally obligated to produce long ago.

**F. The Government Manipulated Evidence Concerning Celona's Conversations with Thomas Lynch of BCBS.**

Similarly, Dimitri's recently-obtained notes reflect that the Government pressured Celona into incriminating Lynch by saying that Lynch knew Celona was being paid by CRI Communications. Dimitri's notes from Celona's March 10, 2005 meeting with the Government reflect:

> That twice during the interview, Celona indicated that he did not think, or did not recall if, Lynch knew he was being paid by CRI Communications;
>
> That the Government told Celona it felt Celona had not told them everything about Lynch;
>
> That the Government told Celona that Lynch was an "evil guy" and was going to "eat [Celona] up;" and
>
> That the Government believed that Celona had been protecting Lynch.

See Exhibit C.

After these threats and intimidation tactics, Celona, not surprisingly, completely changed his testimony and stated that Lynch did know that Celona was getting paid by CRI Communications. Id. This statement, which is highly advantageous to the Government in its efforts to convict Lynch, is completely inconsistent with evidence previously produced by the Government. Every piece of evidence produced by the Government in this case reflects that Celona said he did not tell Lynch that he was getting paid by CRI communications. What is

more, there is no reference in the March 10, 2005 FBI 302 report to any of the Government's threatening or intimidating statements. Thus, Dimitri's notes reveal that the Government intimidated Celona into giving testimony that was both favorable to the Government and completely inconsistent with Celona's prior testimony, and then concealed from the Defendants the tactics it used to secure this testimony, and, the fact that it was given.

**G. The Government Concealed Evidence Pertaining to Benefits Celona Received from BCBS.**

Dimitri's notes likewise reveal that the Government concealed Celona's prior inconsistent statements about benefits he received from BCBS. The combined, partially-redacted Celona FBI 302 report originally produced by the Government states that, on November 4, 2004, Celona said he never received anything of value more than $100 from BCBS. See Exhibit G, p. 23. A review of the recently-produced agents' notes dated September 13, 2004, however, reveals that in addition to stating that he never received anything of value more than $100 from BCBS, Celona also said that his aunt had a job at BCBS. See Exhibit H, p. 4. A review of Dimitri's notes from that same meeting reveals that Celona said even more than that -- that Celona had helped his aunt get that job. See Exhibit I. In other words, the evidence produced by the Government failed to reflect that Celona initially indicated that he did, in fact, receive benefits from BCBS. This information is clearly exculpatory as the Defendants can use it to impeach the Government's key witness at trial.

**H. The Government Concealed Exculpatory Information Pertaining to Celona's Memory About CVS.**

Dimitri's notes also reveal that the Government concealed Celona's ever-changing changing testimony about his ties to CVS. Celona's current position on his involvement with CVS is that he knew as soon as CVS said it was looking for a consultant that CVS was talking

about a bribe. However, Dimitri's notes from September 1, 2004 reveal no such thing. To the contrary, the notes show that, when Celona learned that CVS was looking for a "community relations consultant," he took it to mean "community assistance" – i.e., not a bribe. See Exhibit D. Similarly, Dimitri's notes from September 13, 2004 reflect that when asked if he thought CVS was "right," (meaning legally or ethically), Celona responded, "At times." See Exhibit I. As this is clearly exculpatory impeachment evidence, the Government violated the Defendants' constitutional rights in failing to disclose it.

Dimitri's notes also reveal that the Government concealed Celona's inconsistent statements on the key issue of whether he met with CVS executives in July 1999.[5] Celona's current position is that he met with CVS executives in July 1999. See Exhibit G, pp. 5-6. However, Dimitri's notes reveal that this was not always Celona's recollection, and that Celona changed his testimony only after the Government threatened and intimidated him. For example, Dimitri's notes from Celona's September 1, 2004 meeting with the Government state:

> That the Government told Celona that [CVS Vice President of Government Affairs Carlos Ortiz] said there was a meeting in late 1999 at Celona's office with Ortiz and [CVS Senior Vice President for Community Relations and Governmental Affairs Jack Kramer] to discuss the pharmacy Freedom of Choice legislation;
>
> That Celona said he did not recall this meeting;
>
> That the Government told Celona that Ortiz said that Celona asked for a tour of CVS;
>
> That Celona three times denied requesting a tour of CVS; and
>
> That Celona stated that Ortiz initiated contact with him.

See Exhibit D.

Similarly, Dimitri's notes from Celona's October 25, 2004 meeting with the Government state:

[5] For reasons to lengthy to explain here, the July 1999 meeting with CVS is a very important event.

That the Government told Celona that it had Kramer's appointment book, which reflected a July 8, 1999 meeting at 12:00 with Celona;

That the Government told Celona that Celona's appointment book also reflected a July 8, 1999 meeting with CVS;

That in response to this, Celona indicated that the he did not recall the meeting;

That Celona stated that he did not recall having any conversations with Kramer between May 1999 and January or February of 2000; and

That Celona again indicated that he did not recall a July 1999 meeting with CVS.

See Exhibit A.

At another point in the interview, Celona stated that he did have a tour of CVS in 1999. Id. The Government has produced nothing to the Defendants that reflects Celona's earlier failures of memory described above, nor has the Government produced any evidence reflecting that it effectively coerced Celona into changing his testimony about the July 1999 meeting. Again, were it not for Dimitri's notes, there would be no record of the fact that on multiple previous occasions, Celona gave testimony that is totally inconsistent with his current position on a key issue. This information is clearly exculpatory, as it is fertile grounds for impeachment, and the Government's concealment of it is a clear violation of the Defendants' constitutional rights.

### I. The Government Concealed Exculpatory Information Pertaining to BCBS Legislation.

Celona has admitted to and pled guilty to influencing legislation on behalf of BCBS. However, Dimitri's notes reveal that Celona made exculpatory statements concerning BCBS which are not reflected in any FBI reports. For example, Dimitri's notes reflect that Celona stated that BCBS had a lot of legislation before the committee, that he had a friendly relationship with BCBS, but that BCBS did not do very well before the Senate Corporations Committee, and that he did not have a business relationship with BCBS. See Exhibit D. These statements are not

reflected in any evidence produced by the Government. Similarly, Dimitri's notes show that Celona told the Government that BCBS "lost more than they won" before the Senate Corporations Committee. See Exhibit I. This statement is also not reflected in any evidence produced by the Government; to the contrary, the combined, partially-redacted Celona FBI 302 report produced by the Government says that Celona told the Government that BCBS "got what they wanted most of the time and prevailed on the most significant bills." See Exhibit G, pp. 24-25.

**J. Other Miscellaneous Exculpatory Information Concealed by the Government**

According to Dimitri's March 10, 2005 notes, Celona told the Government that he "came up with" the November 17 request to the Rhode Island Ethics Commission in connection with Blue Cross and Blue Shield. See Exhibit C. This statement is not reflected in any FBI 302 reports produced by the Government.

Dimitri's notes from a September 9, 2004 meeting with Celona and the Government also reflect that, in connection with BCBS doing a television show with CRI Communications, Celona said that he did not threaten or issue any ultimatums to BCBS, and that BCBS "knew that [he] wasn't holding anything over them." See Exhibit D.

The recently-produced agents' notes dated September 13, 2004 also reveal that Celona stated that it was "not uncommon to request where someone stands on bills." See Exhibit H. The Government's theory of prosecution is premised largely on faxes from Celona to Driscoll and/or Urciuoli where Celona asks for RWMC's or Roger Williams Hospital's position on various pieces of legislation. The Government takes the position that such communications are evidence of a scheme to defraud the citizens of Rhode Island of Celona's honest services. Celona's statement that this practice was "not uncommon" is unquestionably exculpatory as it

undermines the Government's theory of prosecution and negates guilt. Not surprisingly, the Government did not produce this information until it knew Dimitri was turning over his notes.

**ARGUMENT**

This Court has broad discretion to fashion a remedy it deems appropriate. The Court should invoke its supervisory power to remedy the Government's repeated violation of the Defendants' constitutional rights. The Defendants respectfully submit that dismissal of the indictment[6] is the only appropriate sanction in light of the extreme prejudice suffered by the Defendants as a result of the Government's violation of the Defendants' constitutional rights and its flagrant pattern of discovery abuses and obstruction of justice. In the alternative, the Defendants request that the Court instruct the jury that the Government withheld exculpatory evidence contrary to the Defendants' constitutional rights and contrary to the Court's orders and that they jury can draw an inference adverse to the Government as a result of that misconduct.

**A. The Court Has the Authority To Fashion a Remedy For the Government's Misconduct.**

Federal courts are endowed with supervisory power to remedy violations of recognized rights, preserve judicial integrity, and deter illegal conduct. United States v. Hasting, 461 U.S. 499, 505 (1983). Under this supervisory power, a court may dismiss an indictment when the misconduct at issue fundamentally subverts the role of the judiciary as an engine in the search for truth. See United States v. Pollock, 417 F. Supp. 1332, 1348 (D. Mass. 1976). Bad faith attempts to destroy or tamper with evidence material to a defendant's guilt or innocence warrant dismissal because such misconduct "passes beyond the line of tolerable human imperfection and falls into the realm of fundamental unfairness." Id. In such circumstances, dismissal of the indictment is the only appropriate remedy. Id. at 1349.

[6] The Defendants' argument in support of dismissal of the Indictment is set forth more fully in the Memorandum of Law in Support of the Defendants Motion to Dismiss the Indictment Due to Prosecutorial Misconduct and For Other Relief.

A defendant's right of access to evidence obtained by the government in federal prosecutions is protected by a variety of statutory and constitutional safeguards. United States v. Pollock, 417 F. Supp. at 1343. In Brady v. Maryland, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Supreme Court has since applied Brady to cases in which the excluded evidence would have been used to impeach a government witness. Giglio v. United States, 405 U.S. 150 (1972). Brady has been further extended to hold that the prosecutor's constitutional duty to produce exculpatory evidence is not limited to cases where the defendant makes a request for such evidence. United States v. Agurs, 427 U.S. 97 (1976).

The purpose of Brady is not to foster theoretical gamesmanship between the prosecution and the defense, but to ensure that a trial is indeed a search for truth based on all relevant evidence, much of which lies in the hands of the government. United States v. Pollock, 417 F. Supp. at 1344. As Justice Marshall noted:

> One of the most basic elements of fairness in a criminal trial is that available evidence tending to show innocence, as well as that tending to show guilt, be fully aired before the jury; more particularly, it is that the State in its zeal to convict a defendant not suppress evidence that might exonerate him…No interest of the State is served, and no duty of the prosecutor advanced, by the suppression of evidence favorable to the defendant. On the contrary, the prosecutor fulfills his most basic responsibility when he fully airs all the relevant evidence at his command.

United States v. Agurs, 427 U.S. at 116 (Marshall, J., dissenting) (internal citations omitted).

Fairness and due process require that all evidence which might have led the jury to entertain a reasonable doubt about a defendant's guilt must be disclosed. United States v. Bryant, 439 F.2d 642, 648 (D.C. Cir. 1971). When confronted with extreme misconduct and

prejudice as a result of delayed disclosure of exculpatory evidence, the court may invoke its supervisory powers to secure enforcement of "better prosecutorial practice and reprimand of those who fail to observe it." Osorio, 929 F.2d at 763; citing United States v. Pacheco-Ortiz, 889 F.2d 301, 310-11 (1st Cir. 1989); see also United States v. Babb, 807 F.2d 272, 279 (1st Cir. 1986).[7]

**B. The Government's Misconduct Warrants Extreme Relief by the Court**

Here, the Government's violation of the Defendants' constitutional rights and its flagrant pattern of discovery abuses and obstruction of justice warrant dismissal of the Indictment. Dismissal of an indictment is an appropriate sanction where, as here, the Government's conduct violates commonly accepted norms of fundamental fairness, is shocking to the universal sense of justice, and distorts the integrity of the judicial process. See United States v. Russell, 411 U.S. 423, 431-32 (1973); United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002); United States v. Nunez, 146 F.3d 36, 38 (1st Cir. 1998); United States v. Matiz, 14 F.3d 79, 82 (1st Cir. 1994); United States v. Giorgi, 840 F.2d 1022, 1030 (1st Cir. 1988) (citations omitted); United States v. Ogden, 703 F.2d 629, 636 (1st Cir. 1983) (citations omitted).

As set forth more fully in Defendants' Memorandum of Law in Support of Motion to Dismiss Indictment Due to Prosecutorial Misconduct, the Government's misconduct, in essence, amounts the destruction of material, exculpatory evidence. As such, it warrants the extreme

[7] In addition to violating the Defendants' constitutional rights, the Government's misconduct described above constitutes flagrant non-compliance with this Court's discovery orders and the mandates of Federal Rule of Criminal Procedure 16. District courts have broad discretion in addressing non-compliance with discovery orders under the provisions of the Federal Rules of Criminal Procedure. See Fed. R. Crim. P. 16; see also United States v. Osorio, 929 F.2d 753, 762 (1st Cir. 1991); citing United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979); United States v. Gladney, 563 F.2d 491, 494 (1st Cir. 1977). The remedies available to a court to address discovery violations include dismissal of the indictment, as well as instructions to the jury that the Government failed to satisfy its discovery obligations to the defendant. See Osorio, 929 F.2d at 763; citing United States v. Hemmer, 729 F.2d 10, 13 (1st Cir.), cert. denied, Randazza v. United States, 467 U.S. 1218 (1984); United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979).

sanction of dismissal. See United States v. Pollock, 417 F. Supp. 1332 (indictment dismissed where the government acted in bad faith and the lost evidence was material).

Indeed, federal courts have dismissed indictments in the face of prosecutorial misconduct much less nefarious than the Government's misconduct here. See, e.g., United States v. Diabate, 90 F.Supp.2d 140, 144 (D. Mass 2000) (dismissing indictment as sanction to government where government's failure to satisfy its discovery obligations, including the late disclosure of exculpatory material and destruction of other exculpatory evidence, was result of the Government's failure to advise agencies and agents of their obligation to preserve contemporaneous notes and other investigative records, as opposed to the result of federal agents' intentional failure to include exculpatory information in their notes and records). The Defendants respectfully submit that the Government's violation of the Defendants' constitutional rights, consistent pattern and practice of flagrant discovery abuses, and obstruction of justice warrant dismissal. There are a number of mechanisms that a trial judge might employ upon request – or *sua sponte* when confronting government failure to comply with its disclosure obligations. Osorio, 929 F.2d at 763; Gladney, 563 F.2d at 494. Dismissal is appropriate where, as here, the United States Attorney's Office engages in a consistent pattern and practice of nondisclosure, resulting in actual prejudice to the defendants. Id.; citing United States v. Hemmer, 729 F.2d 10, 13 (1st Cir.), cert. denied, Randazza v. United States, 467 U.S. 1218 (1984); United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979).

However, in the event that the Court is not inclined to dismiss the Indictment, the Court may still invoke its broad supervisory power and fashion what it deems to be an appropriate remedy. As an alternative to dismissal of the Indictment, the Defendants respectfully request that the Court instruct the jury that the Government has withheld exculpatory evidence from the

Defendants in violation of their constitutional rights and this Court's Orders, and that the jury can draw an adverse inference against the Government, which alone can cause doubt.

**CONCLUSION**

For all of the foregoing reasons, Defendants Robert A. Urciuoli, Frances P. Driscoll and Peter J. Sangermano respectfully request that the Court Dismiss the Indictment. In the alternative to dismissal, the Defendants respectfully request that the Court instruct the jury that the Government has withheld exculpatory evidence from the Defendants in violation of their constitutional rights and this Court's Orders, from which it may draw a negative inference against the Government.

Respectfully submitted,

ROBERT A. URCIUOLI

By his Attorneys,

/s/ Kristie M. Passalacqua
Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalacqua@haslaw.com

Michael J. Connolly (MA BBO # 638811)
*Pro Hac Vice Counsel*
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (fax)
mconnolly@haslaw.com

Richard M. Egbert (MA BBO #151800)
*Pro Hac Vice Counsel*
Richard Egbert Law Offices
99 Summer Street
Suite 1800
Boston, Massachusetts 02110
(617) 737-8222
(617) 737-8223 (fax)
regbert@egbertlaw.com

FRANCES P. DRISCOLL

By her Attorney,

/s/ Kevin J. Bristow________________________

Kevin J. Bristow, Bar No. 3984
1309 Turks Head Building
Providence, RI 02903
(401) 521-2849
kjbristowlaw@verizon.net

PETER J. SANGERMANO

By his Attorneys,

/s/ A. John Pappalardo____________________

James P. Redding, Esq.
A. John Pappalardo, Esq.
Greenburg Traurig LLP
One International Place
Boston, MA 02110
reddingj@gtlaw.com
pappalardoj@gtlaw.com

Dated: September 13, 2006

**CERTIFICATION**

I hereby certify that on September 13, 2006, a copy of the foregoing Supplemental Memorandum of Law in Support of Defendants' Motion to Dismiss Indictment due to Prosecutorial Misconduct and For Other Relief was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kristie M. Passalacqua
Kristie M. Passalacqua, Bar No. 6945
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
kpassalacqua@haslaw.com