**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-02-01-T** |
| **ROBERT A. URCIUOLI,**<br>**FRANCES P. DRISCOLL, and**<br>**PETER J. SANGERMANO, JR.** | ) | |

**DEFENDANT PETER J. SANGERMANO, JR.'S**
**MOTION FOR JUDGMENT OF ACQUITTAL**

NOW COMES Defendant Peter J. Sangermano, Jr. ("Mr. Sangermano") and respectfully moves, pursuant to Fed. R. Crim. P. 29(a), that this Court grant him a judgment for acquittal. In support of this Motion, Defendants rely on their accompanying Revised Memorandum of Law, submitted herewith and incorporated by reference.

WHEREFORE, Defendant Peter J. Sangermano, Jr. respectfully requests that this Court grant him a judgment for acquittal.

Respectfully submitted,

PETER J. SANGERMANO, JR.,
By his attorneys,

____/s/ Evan Georgopoulos______
James P. Redding (Bar No. 2976)
A. John Pappalardo
Evan Georgopoulos
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
(617) 310-6000
reddingj@gtlaw.com
pappalardoj@gtlaw.com
georgopoulose@gtlaw.com

Dated: October 1, 2006

**CERTIFICATION**

I hereby certify that on October 1, 2006 a copy of the foregoing was electronically filed and served by mail upon counsel unable to accept electronic filing. Notice of this filing shall be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

____/s/ Evan Georgopoulos______
Evan Georgopoulos

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **CRIMINAL NO. 06-02-01-T** |
| **ROBERT A. URCIUOLI,** **FRANCES P. DRISCOLL, and** **PETER J. SANGERMANO, JR.** | ) | |

**REVISED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PETER J. SANGERMANO, JR.'S <u>MOTION FOR JUDGMENT OF ACQUITTAL</u>**

Pursuant to Fed. R. Crim. P. 29(a), Defendant Peter J. Sangermano, Jr. ("Mr. Sangermano"), through counsel, respectfully submits this revised memorandum of law in support of his Motion for Judgment of Acquittal. In support of this Motion,[1] as is set forth more fully below, Mr. Sangermano states the government has utterly failed to meet its burden of presenting sufficient evidence by which a reasonable trier of fact could find Mr. Sangermano is guilty beyond a reasonable doubt of knowingly and willfully either violating, or aiding or abetting others in the violation of, the federal mail fraud statute incident to a scheme to defraud the State of Rhode Island and its citizenry of the honest services of former state senator John Celona, as alleged in the charged substantive offenses, Counts 2-38 of the Indictment, or of conspiring to defraud the State of Rhode Island and its citizenry of the honest services of former state senator John Celona, as alleged in Count 1.

## STANDARD OF REVIEW

Rule 29 directs the Court to enter a judgment of acquittal on any and all counts where the evidence adduced at trial, viewed in the light most favorable to the government and taking all

[1] Counsel for Mr. Sangermano note that as they do not have access to a transcript of any kind of this trial, they are limited to summarizing events that occurred therein on the basis of memory and available notes.

reasonable inferences in its favor, is so insufficient that no rational trier of fact could find proof beyond a reasonable doubt that the government has successfully proved the essential elements of the crimes charged. United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002); Fed. R. Crim. P. 29(a). In making this assessment on a Rule 29 motion, the Court of Appeals for the First Circuit instructs that the Court must "take a hard look at the record and [] reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." United States v. Woodward, 149 F.3d 56, 57 (1st Cir. 1998) (citations omitted). Thus framed, the only reasonable course in view of the evidence adduced at trial is a judgment of acquittal on all counts charged against Mr. Sangermano.

## ARGUMENT

### I. NO REASONABLE TRIER OF FACT COULD FIND MR. SANGERMANO IS GUILTY BEYOND A REASONABLE DOUBT OF SUBSTANTIVE, AIDING OR ABETTING IN THE COMMISSION OF, OR CONSPIRING TO COMMIT, HONEST SERVICES MAIL FRAUD VIOLATIONS.

#### A. The Elements Of Honest Services Mail Fraud.

To prove honest services mail fraud, the government must adduce evidence sufficient to prove beyond a reasonable doubt each of the elements of mail fraud under 18 U.S.C. § 1341 and the requirements 18 U.S.C. § 1346. Mail fraud requires proof that the defendant: (1) participated in a scheme or artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona;[2] (2) knowingly, willfully and with specific intent to defraud; and (3) used the mails in furtherance of the scheme as specified in the Indictment. Woodward, 149 F.3d at 54.

[2] Section 1346 defines the term "scheme or artifice to defraud" as a scheme or artifice to deprive another of the intangible right of honest services.

"Knowingly" means to act voluntarily and deliberately, rather than by mistake or inadvertence. "Willfully" means to act knowingly and purposely, with intent to do something the law forbids . . . with bad purposes either to disobey or to disregard the law." Id. In other words, the government must prove beyond a reasonable doubt that Mr. Sangermano believed he was committing a crime or violating the law at the time that he made use of the mails. Id. Good faith is a complete defense to mail fraud, and the burden is on the government to prove lack of good faith beyond a reasonable doubt. Id.

In honest services cases, the "requirement that the defendant act with specific intent to defraud encompasses both an intent to deprive the public of the honest performance of the public official's service and an intent to deceive the public." United States v. Potter, No. CR 03-081 ML, 2005 WL 2367677, *6 (D.R.I. Sept. 27, 2005) (citing United States v. Sawyer, 239 F.3d 31, 41 (1st Cir. 2001) ("Sawyer II"); see also United States v. Sawyer, 85 F.3d 713, 729 (1st Cir. 1996) ("Sawyer I"). For the government to establish the intent to deprive the public of an official's honest services, it must prove that the defendant intended to influence the legislator in his "*official* action." Id. at 729 (emphasis added).

Moreover, with respect to the element of deception, the scheme "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." United States v. Hawkey, 148 F.3d 920, 924 (8th Cir. 1998) (citation and internal quotation marks omitted). In cases against non-public officials, such as this, the government must prove that the target of the scheme is the deprivation of the official's honest services. Sawyer I, 85 F.3d at 725, citing United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the

defendant's fraudulent intent."); United States v. Von Barta, 635 F. 2d 999, 1005-06 n.14 (2d Cir. 1980) ("the prosecution must prove that some actual harm or injury was at least contemplated").

Further, to establish the specific criminal intent to deceive the public, the government must show that the defendant knew that his or her actions were fraudulent and, despite this knowledge, proceeded to take steps designed to conceal these fraudulent actions. Sawyer II, 239 F.3d at 39, 47; see also United States v. Grandmaison, 77 F.3d 555, 558 (1st Cir. 1996) (after defendant recused himself from local governing board based on a conflict of interest, the defendant "secretly took steps to manipulate the contracts" by giving other board members information tapes, gifts, and gratuities); United States v. Silvano, 812 F.2d 754, 756-58 (1st Cir. 1987) (defendants continually made intentional and knowing false statements to other public officials with the specific intent to deceive them).

With respect to aiding and abetting, the elements here are (1) the commission of the substantive offense charged by another, and (2) the defendant's willful participation in the substantive offense as something he wished to bring about. That is, the defendant must have consciously shared the principal's knowledge of the substantive crime, and intended to help the principal bring that about by some action on his own, with the intent to act with a bad purpose either to disobey or disregard the law. 18 U.S.C. § 2. In short, the intent is for purposes here identical to that recounted above in connection with the substantive offense of honest services mail fraud.

### B. The Elements Of Conspiracy To Commit Honest Services Mail Fraud.

To prove Mr. Sangermano conspired to commit honest services mail fraud, the government is required to prove: (1) that the unlawful agreement charged in the Indictment

existed between at least two people; (2) that Mr. Sangermano knowingly, willfully and voluntarily joined in that agreement; (3) that at some point during the existence of the conspiracy one of its members committed at least one of the overt act charged in the Indictment; and (4) that overt act was committed to further or advance some objective of the conspiracy. United States v. Ortiz, 447 F.3d 28, 32-33 (1st Cir. 2006).

**C. The Government Has Failed To Adduce Evidence At Trial To Support Any Rational Trier Of Fact's Finding Mr. Sangermano's Guilt Beyond A Reasonable Doubt Of Any Of The Charged Offenses.**

The government's evidence against Mr. Sangermano is indirect, predicated on overly speculative inferences that are rendered wholly unreasonable nullities by the weight of credible evidence adduced at trial. In the main, the government's evidence against Mr. Sangermano may be broken down into the following categories, each of which in turn is relied upon as a basis, for example, of inferring Mr. Sangermano's having had knowledge of and having entered into a conspiracy or scheme, and of his having the requisite criminal intent. Each of these core allegations as to Mr. Sangermano collapse under the weight of the evidence adduced at trial, and preclude any reasonable trier of fact from finding him guilty beyond a reasonable doubt of the charges leveled against him.

1. Mr. Sangermano's Alleged Participation In The Drafting Of The Consulting Agreement So That It Was False And Fraudulent Is Without Any Evidentiary Support.

The government alleges that from on or about October 15, 1997 to on or about July 22, 1998, Mr. Sangermano "caused the consulting agreement to be drafted, redrafted, and executed in a manner so that it falsely and fraudulently purported to be" between Celona and the Village at Elmhurst, not Celona and Roger Williams Medical Center ("RWMC"). See Indictment, ¶ 25.

In fact, the evidence adduced at trial was all to the contrary: The government's witness, James McGuirk, Esq., the primary person responsible for drafting the consulting agreement, testified on direct examination that he did not speak or meet with Mr. Sangermano relative to the drafting of the consulting agreement at any time.

Mr. Sangermano's witness, Steven Rosenbaum, Esq., testified that he had conversations with Mr. Sangermano as his counsel in late 1997 and early 1998 relating to the drafting of the consulting agreement, but only to the extent as to whether Mr. Sangermano wished to enter into the contract and what concessions he would receive from Roger Williams Realty Corporation ("Roger Williams Realty"), an equal partner with SANAT Properties, LP ("SANAT") in the Village at Elmhurst. Mr. Rosenbaum further testified that Mr. Sangermano had played no role in the drafting of the consulting agreement. Critically, Mr. Rosenbaum testified that he advised Mr. Sangermano to sign off on the consulting agreement on behalf of the Village of Elmhurst as that entity's authorized signatory only *after* the operating agreement between Roger Williams Realty and SANAT had been amended to provide that the Village at Elmhurst would be indemnified for any costs related to the hiring of Mr. Celona, that Mr. Celona had been retained at the request of Roger Williams Realty, that his consulting fees would be paid out of Roger Williams Realty's share of the profits from the Village at Elmhurst, and the Ethics Commission actually had issued an Advisory Opinion as to the propriety of the consulting arrangement. It was only once these requirements were met, Mr. Rosenbaum testified, that he advised Mr. Sangermano as his counsel that there was "no hindrance" to his executing the consulting agreement, as the authorized signatory for the Village at Elmhurst.

Furthermore, as discussed below, the consulting agreement accurately set forth the terms of the consulting relationship between Mr. Celona and the Village at Elmhurst, is a contract

which Mr. Celona admitted he performed for more than four years, and with respect to which performance ample evidence was also provided by Mr. Sangermano's witness, Ms. Jennifer DeLuca, who personally interacted with Mr. Celona during his provision of these services on numerous occasions.

While there is some evidence that Mr. Sangermano, through counsel, indicated that he did not wish to have Mr. Celona provide consulting services for the already mature institution, the Village at Waterman Lake, and that he did not wish to provide an office for Mr. Celona at the Village at Elmhurst, it is not at all probative of the government's inculpatory allegations. There is nothing in these acts themselves, nor in any reasonable interpretation of them, that would permit any reasonable trier to find beyond a reasonable doubt that Mr. Sangermano knowingly and willfully did what the government, and the criminal law, is really concerned with here: participating in the drafting of the consulting agreement so that it was false and fraudulent. There simply has been no evidence adduced beyond this, and thus no reasonable trier of fact could find beyond a reasonable doubt that Mr. Sangermano's minimal and indirect (i.e., through counsel) participation in the drafting of the consulting agreement provides basis for a finding of the requisite intent on his part for the commission of the substantive offenses, the aiding or abetting thereof, or conspiring to commit same.

Thus, the government, in advancing this position, relies upon an unstated premise for which it has offered no direct or indirect evidence what so ever, that is, that Mr. Sangermano had actual knowledge that Mr. Celona was providing any services for RWMC which were improper. Neither has the government laid the necessary foundation for the contention that Mr. Sangermano was willfully blind to the alleged improprieties of Mr. Celona on behalf of RWMC.[3]

---

[3] The government, in failing to have requested the Court to include a willful blindness instruction at the Charging Conference held on Friday, September 29, 2006, seemingly has conceded this point.

The government relies on evidence that Mr. Sangermano, in the fall of 1997, originally was reluctant to enter into the consulting agreement, because he did not think Mr. Celona would provide value. It is true that such evidence exists, but it cannot reasonably support the inference which the government would draw from it: that Mr. Sangermano, in finally signing off on the consulting agreement in the summer of 1998, had knowledge of the alleged improper nature of the consulting agreement, as a ruse for keeping clandestine what the government contends was its true purpose of Celona's acting improperly on behalf of RWMC. The government invites the trier of fact to hang the burden of proof beyond a reasonable doubt of Mr. Sangermano's *mens rea* on a slender, speculative reed, that manifestly cannot support that weight.

The government's desired inference from Mr. Sangermano's eventual signing off on the consulting agreement after having initially opposed it is rendered untenable because of the very different circumstances which existed in the fall of 1997, when Mr. Sangermano opposed the consulting agreement, and when he signed it, in the summer of 1998. The only evidence adduced at trial was that as originally proposed, the consulting costs were to have been paid by the Village at Elmhurst, that is, by the partners, Roger Williams Realty and SANAT, equally. Because Mr. Sangermano did not believe at that time, as the evidence supports, that Mr. Celona would be of value for the Village at Elmhurst, he did not wish to pay for it out of SANAT's profits, one quarter of which were his own.

By the summer of 1998, however, when Mr. Sangermano actually signed the consulting agreement, the facts, and with them the cost/benefit analysis from Mr. Sangermano's perspective, had materially changed. Specifically, Roger William Realty had agreed to bear the costs of the consulting fees for Mr. Celona's services to the Village at Elmhurst entirely out of its own share of the profits from said Village, and the operating agreement had been amended to

memorialize this allocation of costs. See Gov. Ex. 176 at 2 ("'All deductions for payments by the Company [i.e., the Village at Elmhurst] to John Celona, a health care consultant for seniors, shall be specially allocated and debited to the Capital Account of Roger Williams Realty Corporation.'"). Additionally, Roger Williams Realty, in writing, acknowledged that Celona was being engaged "as a consultant pursuant to the terms of the Consulting Agreement" at its request, and agreed "to indemnify the Village at Elmhurst for any additional costs or expense associated with Celona's engagement as a consultant." Id. at 1. Finally, as Steven Rosenbaum, Esq. testified on direct examination, it was only after each of these conditions had been met, and the Advisory Opinion of the Ethics Commission had issued approving the consulting arrangement, that he advised his client Mr. Sangermano that there was no hindrance to his signing the consulting agreement as the official signatory of the Village at Elmhurst. Accordingly, when, some time after June 17, 1998, Mr. Sangermano executed the consulting agreement in his official capacity as signatory for the Village at Elmhurst, in reliance on advice of his counsel, he was presented with what was an economically costless and (so far as Mr. Sangermano knew or had reason to know) legally risk free arrangement that Roger Williams Realty, a 50% partner in the Village at Elmhurst, wanted. In these circumstances, the inference on which the government bases its case against Mr. Sangermano is not sufficient for any reasonable trier of fact to find Mr. Sangermano guilty beyond a reasonable doubt of the charges against him.

2. Mr. Sangermano's Alleged Participation In Subsequent Revisions To The Consulting Agreement So That It Was False And Fraudulent Is Without Any Evidentiary Support.

The government alleges Mr. Sangermano sent a letter to Mr. Celona in October of 2000 enclosing two copies of the Consulting Agreement and requesting that Celona sign the copies

and return them to Mr. Sangermano's attention. See Indictment, ¶ 93. Further, the government alleges, "Sangermano did not amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC." Id.

As noted above, James McGuirk, Esq., testified on cross-examination that Mr. Sangermano, according to the Village at Elmhurst's operating agreement, was the only person authorized to sign contracts involving the Village at Elmhurst. Again, no evidence was adduced by the government at trial that Mr. Sangermano played any role in the drafting of the consulting agreement.

As to the allegation that the Consulting Agreement did not reflect the "true identity" of Celona's employer and the "true nature" of Celona's work, Mr. Sangermano, as is more fully discussed in Section 5 below, set forth evidence through the testimony of Ms. Jennifer Deluca, Ms. Diane Sangermano and multiple exhibits demonstrating that Mr. Celona worked for the Village at Elmhurst, as provided for under the terms of the consulting agreement. No evidence has been adduced at trial that Mr. Sangermano played any role in the drafting of the renewed consulting agreement.

Mr. Celona testified on direct examination that in the two instances when he sought raises, he approached defendant Mr. Robert Urciuoli, who facilitated the renewal of the consulting agreement and the increase in compensation, and further testified that he had no dealings with Mr. Sangermano on these matters.

Kimberly O'Connell, Esq., when called by the government, testified that she was involved in each renewal of the consulting agreement. Ms. O'Connell did not mention Mr.

Sangermano in any form with respect to involvement in re-drafting and renewal of the consulting agreement. In fact, absent his signing on behalf of the Village at Elmhurst as its authorized signatory, there has been a complete absence of evidence that Mr. Sangermano was involved in any way in the renewal of the consulting agreement.

As for Mr. Sangermano's alleged failure to "amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC," Indictment, ¶ 93, this merely begs the question. The government has failed to adduce any evidence of who or what provided Mr. Sangermano with knowledge of the alleged "true nature of [Mr.] Celona's employment with RWMC," and when this supposedly occurred. Thus, the government, in advancing this position, relies upon a premise for which it has offered no direct or indirect evidence whatsoever -- that Mr. Sangermano had actual knowledge that Mr. Celona was providing any services for RWMC which were improper.

To say then, as the government does, that Mr. Sangermano failed to approach the Ethics Commission in connection with the revisions to the amount of consulting fees paid and the term of the consulting agreement, is to say nothing at all probative of Mr. Sangermano's guilt or innocence. Absent the government's having adduced evidence to reasonably support the inference, beyond a reasonable doubt, that Mr. Sangermano had knowledge of the alleged improprieties Mr. Celona performed for RWMC, and that he intended to by his inaction to facilitate those improprieties in contravention of the law and with the intent to deprive the State of Rhode Island and its citizenry of Mr. Celona's honest services, the government cannot rely upon these acts or failure to act for anything. To the extent that Mr. Sangermano is involved in the sense of his signing off on the revised consulting agreements, again, this was a function of

his official role as signatory for the Village at Elmhurst, and does not in any way speak to his knowledge or intent.

3. Mr. Sangermano's Alleged Misuse Of Mr. Celona In Connection With The Alzheimer's Legislation Is Not Supported By Sufficient Credible Evidence Adduced At Trial.

Insufficient credible evidence was adduced at trial to support a determination by any reasonable trier of fact that any communication at all took place between Mr. Celona and Mr. Sangermano relative to this bill. The government alleges, in connection with the so-called Alzheimer's Legislation, that:

> Driscoll and Sangermano directed Celona to work "defeat" Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities,' which would prohibit health facilities (such as the Village [at Elmhurst]) from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. Such an Act if, enacted into law, would have a negative impact on the finances of the Village [at Elmhurst] in that the Village [of Elmhurst] would not be allowed to offer Alzheimer's care to patients without being licensed as a nursing home or hospital.

See Indictment, ¶ 33.

On cross-examination, Mr. Celona flat out contradicted what the government alleged above, and, indeed, what he had testified to on direct. Mr. Celona testified on cross-examination that: (1) he did not recall any conversations with Mr. Sangermano regarding the Alzheimer's Legislation; (2) he did not send Mr. Sangermano a copy of the bill; (3) he has no memory of Mrs. Driscoll telling him to contact Mr. Sangermano regarding the bill; and further (4) he did not even know if Mr. Sangermano held a position on the legislation. Thereafter, confronted with his Grand Jury testimony on this point, Mr. Celona immediately contradicted himself, yet again, to change his testimony to effect that he did discuss this House bill with Mr. Sangermano, and that Mr. Sangermano must have contacted him to address a House bill because he "did not understand the political process."

Mr. Sangermano's witness, Mr. Vincent Mesolella, a former Rhode Island State Representative, the sole sponsor of the Alzheimer's Legislation, testified that he never had a conversation with Mr. Celona relating to House Bill 98-H 8229.[4]

4. Mr. Sangermano's Alleged Misuse Of Mr. Celona In Connection With The Moratorium Legislation Is Not Supported By Sufficient Credible Evidence Adduced At Trial.

The government alleges, in connection with the so-called Moratorium Legislation, that "Sangermano asked Celona to have a State Representative and a State Senator sponsor a bill amending the extension of the moratorium on licensing new nursing home beds, House Bill 99-H 6122. Such an amendment was expected to have a positive impact on the finances of the Village [at Elmhurst]." See Indictment, ¶ 50.

Mr. Celona testified on direct and cross-examination that the Moratorium Legislation would benefit the Village at Elmhurst, stating on cross that the legislation would result in the licensure of more nursing beds, and hence more money, for the Village at Elmhurst. To the contrary, as was made clear by the cross-examination testimony of Messers. Dean Martins and Robert Budway, both witnesses for the government, the Village at Elmhurst simply would not and could not have possibly received a benefit from the Moratorium Legislation.

Further, an exhibit admitted through and created and certified by Mr. Budway, indisputably demonstrates that the Moratorium Legislation was expected to have an impact upon the Village of Waterman Lake and would have no impact on the Village at Elmhurst, much less have a "positive impact on the finances of the Village [at Elmhurst]." See Sangermano Exhibit EEEEE at p. 5 (stating requested nursing beds are for Waterman Lake, and specifically not for Village at Elmhurst). The Village at Waterman Lake is a distinct and separate entity from the

[4] Both the testimony of Mr. Celona and Mr. Mesolella clearly establish that the Alzheimer's Legislation was a House Bill, and not a Senate Bill, as is erroneously alleged in the Indictment.

Village at Elmhurst, and has no corporate relation to Roger Williams Realty, or its parent, RWMC. Indeed, the Village at Waterman Lake is not referenced anywhere in the Indictment.

The moratorium legislation -- an amendment to an existing bill -- was plainly shown to have been for the benefit of the Village at Waterman Lake, and not the Village of Elmhurst. The government had been apprised of its error by Mr. Sangermano's previous counsel well in advance of trial, but took no action to correct it.

The need for much discussion of the government's error in the drafting of the Indictment on this particular point, however, is obviated by the absence of evidence adduced by the government as to it. Specifically, the evidence set forth at trial established that Mr. Celona was asked to find legislators to "introduce" the Moratorium Legislation amendment, rather than "sponsor" the legislation as asserted in the Indictment. Mr. Celona stated on direct that he "tapped" Senator Ruggerio for this purpose. The government presented no evidence whatsoever tending to prove that merely asking Mr. Celona to find a representative and senator to introduce legislation constituted a legislative act in violation of the Rhode Island Ethics Commission Advisory Opinion 98-59, and certainly no evidence suggesting that Mr. Sangermano believed it to have been improper.

In addition, the origins of the proposed amendment to the Moratorium legislation also powerfully tend to negate that Mr. Sangermano possessed the requisite *mens rea*. For example, the only evidence presented at trial was that the idea of an amendment to the legislation originated with Mr. Budway, as he testified on cross-examination, and that he had an attorney with whom he previously had worked draft the amendment. Mr. Budway also testified that Mr. Sangermano had retained a lobbyist, Mr. David Kerins, to further the amendment, and that Budway had conferred with him four or five times. Mr. Budway testified that he had no

recollection of Mr. Sangermano speaking to him of Mr. Celona in connection with this legislation.

Critically, and dispositively, Mr. Celona testified on direct that he recused himself from the discussion of and vote on the Moratorium legislation, and on June 30, 1999 filed a Section 6 statement citing his consulting agreement with the Village at Elmhurst as the basis of the conflict and cause for his recusal. See U. Ex. IIIIII 46 at 1 (requesting excusal because of "potential conflict of interest as follows:" "Consultant at Village At Elmhurst A.O. # 98-59"). Mr. Martins testified on cross that he knew nothing of Mr. Celona's having had any involvement in the Moratorium amendment; he specifically recalled that Mr. Celona was not present on the hearing of the bill in the General Assembly.

Thus, the only evidence adduced with respect to the Moratorium legislation is that Mr. Celona acted in conformity with the plain terms of the Advisory Opinion 98-59. Even if one were to assume, for purposes of argument only, that the government had adduced necessary and sufficient evidence to support the allegation that the Advisory Opinion was obtained under fraudulent circumstances as issued, it nevertheless spoke precisely to legislation affecting assisted living facilities, such as the amendment to the proposed Moratorium legislation, from which Mr. Celona, appropriately, recused himself. Under either assumption, the evidence adduced at trial does not permit any reasonable trier of fact to find as the government contends.

5. The Allegation That Mr. Celona Did Not Provide Services To The Village At Elmhurst, And That The Consulting Agreement Was A Sham Is Not Supported By Sufficient Credible Evidence Adduced At Trial.

The evidence adduced at trial so overwhelmingly and consistently demonstrated the fact that Mr. Celona performed contracted for consulting services to the Village at Elmhurst, that little need be said on this point. The premise that the government has advanced that the

arrangement with the Village of Elmhurst was a sham is contradicted by the overwhelming weight of credible evidence. The government's own witnesses – most significantly, Mr.Celona – refuted the proposition that Mr. Celona did not perform work for the Village of Elmhurst. In fact, Mr. Celona testified on cross-examination that he performed duties under the consulting agreement, and testified as to specific events in which he took part at the Village at Elmhurst. In sum, the government's key witness, Mr. Celona testified: "I had a contract at the Village at Elmhurst, and I performed that contract."

In addition, Mr. Sangermano's witness, Ms. Jennifer Deluca, testified as to numerous marketing events in which Mr. Celona took part, including: events in which he participated and at which he spoke; television shows scripted by Ms. Deluca, and hosted by Mr. Celona which promoted the Village at Elmhurst; and referrals and leads for new residents brought to the Village at Elmhurst by Celona. Her unchallenged testimony clearly established that Mr. Celona provided a multitude of services and marketing work to the Village at Elmhurst, and additionally contributed in the form of referrals to the Village at Elmhurst. See, e.g., S. Exs. OO-1, NN, PP, QQ, RR, TT, HHHHH, IIIII, JJJJJ, KKKKK, LLLLL, MMMMM, NNNNN, OOOOO, QQQQQ, SSSSS, TTTTT, UUUUU, VVVVV, WWWWW, XXXXX, YYYYY, ZZZZZ, AAAAAA, BBBBBB, CCCCCCC, EEEEEE, FFFFFF, HHHHHH, IIIIII, JJJJJJ, KKKKKK, LLLLLL; and Gov. Exs. 216, 318 (evidencing various marketing events that John Celona took part in on behalf of the Village at Elmhurst); see also S. Exs. NNNNNN and OOOOOO (reflecting Celona's referrals to the Village at Elmhurst).

As Mr. Celona himself testified: "I was a credit to the Village and all that."

## II. JUDGMENT OF ACQUITTAL FOR MR. SANGERMANO ON ALL CHARGED COUNTS IS APPROPRIATE ON THE BASIS OF THE GOVERNMENT'S MISCONDUCT.

For the additional reason of the government's misconduct, as is set forth in part in the previously filed Defendants' Motion to Dismiss the Indictment Due to Prosecutorial Misconduct (including, without limitation, all supplementary filings thereto) and which is incorporated herein by reference, a judgment of acquittal on all charges should be entered for Mr. Sangermano.

The evidence adduced at trial has not only failed to support, but instead has powerfully and convincingly refuted the government's allegations against Mr. Sangermano. This Court's order of a judgment of acquittal on all charges for Mr. Sangermano will have the salubrious effect of bringing to a merciful end what has been, as against him at least, a travesty of a prosecution, and spare Mr. Sangermano any further indignity and legal costs.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should enter a judgment of acquittal for Mr. Sangermano on all charged counts.

Respectfully submitted,

PETER J. SANGERMANO, JR.,

By his attorneys,

____/s/ Evan Georgopoulos______

James P. Redding (Bar No. 2976)
A. John Pappalardo
Evan Georgopoulos
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
(617) 310-6000
reddingj@gtlaw.com
pappalardoj@gtlaw.com
georgopoulose@gtlaw.com

Dated: October 1, 2006

**CERTIFICATION**

I hereby certify that on October 1, 2006, a copy of the foregoing was electronically filed and served by mail upon counsel unable to accept electronic filing. Notice of this filing shall be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

____/s/ Evan Georgopoulos______
Evan Georgopoulos