UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

ROGER WILLIAMS MEDICAL CENTER

Testimony of RICHARD A. LICHT, ESQUIRE, a Witness herein, heard before the JUNE 2005 SPECIAL GRAND JURY on TUESDAY, NOVEMBER 15TH, 2005, 1:10 P.M., in Room 126A of the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

LUIS M. MATOS, ESQUIRE
ASSISTANT U.S. ATTORNEY

GERARD B. SULLIVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

Diane J. DeStefano, RPR
15 Seabreeze Terrace
South Kingstown, Rhode Island 02879
(401) 782-4441

know.

Q. You don't know specifically if anyone did?

A. No.

Q. Do you know if Roger Williams specifically, as an entity, whether it donated to any of your campaigns?

A. No, the entity would not have.

Q. When you went on the board in the late '80s, how big was the board approximately?

A. The board, I would say, was approximately two dozen people.

Q. And is it fair to say that there's one general board that's referred to as the board of trustees; is that right?

A. Yes.

Q. And there's an executive committee as well?

A. Correct.

Q. Can you explain the distinction between the two?

A. The board is a larger group, and the board meets approximately four or five times a year. The executive committee has the responsibility and the powers of the board to act between board meetings.

Everybody who is on the executive committee is a member of the board, but that's a smaller group that is five, six or seven people, and they meet

monthly, and if there's an issue that would require it, even more frequently.

Q. So they -- is it fair to say that the executive committee has more regular contact with what's going on in the hospital on a routine basis than the board of trustees?

A. Yes. I would say that.

Q. And the executive committee has a chairman or chairperson?

A. The chairman I believe is the same for both.

Q. That's what my next question was going to be.

A. The chairman of the board chairs the executive committee.

Q. Were you on the executive committee for a period of time?

A. I -- yes, but -- yes.

Q. Was there a but there?

A. Well, not the whole time.

Q. Well, what period of time were you on the executive committee?

A. I believe I came on the executive committee probably in 1996 or 1997.

Q. Okay. How did you come to be on the executive committee?

A. I was asked by the chairman of the board.
Q. And who was that at the time?
A. I think it was Jay Sarles, but I can't remember exactly.
Q. And how long did you stay on the executive committee?
A. I remain on the executive committee.
Q. And so, obviously, you are still a member of the board as well, correct?
A. Yes.
Q. In the mid-to late-'90s, is it fair to say that the hospital was experiencing some financial difficulties?
A. Yes.
Q. And there has been -- the grand jury has heard testimony about the Hospital Conversion Act and the hospital's attempts to merge with another entity, specifically Columbia/HCA. That took place in approximately 1997; is that correct?
A. The precise date I can't remember, but if you tell me it's '97, I would accept that. I would have said it started in '96, but it doesn't really matter.
Q. Your recollection is what we're going to rely on here, Mr. Licht. You were on the executive committee

A. Yes. I didn't know if they were familiar with it or not.

Q. We'll try to provide some background on that.

A. Okay.

Q. Can you explain how that came about initially?

A. Yes, and it was in the same time frame. By being the same time frame, it was in 1998, the spring of 1998. The president of the medical staff was someone named Dr. O'Dowd, and he gave -- I believe the chairman of the board at the time was Mr. Cummings, and he gave him a list --

Q. Can I interrupt you for a second? What does it mean to be the chairman of the medical staff?

A. The chairman of the medical staff is elected by the medical staff. As you know, there are people with what they call privileges who have the right to come in and work at our hospital. Some are actually on the staff, in other words, are employees of the hospital, and others are independent doctors who can bring in their patients and use our facilities at the hospital.

And the medical staff elects officers and they deal with the hospital administration on issues that affect the doctors and medical care at the hospital. And, in addition, I believe our bylaws

he had access to all records that the hospital had.
Q. But he was not to go outside the hospital community; is that correct? Is that correct?
A. Oh, I'm sorry, yes.
Q. For instance, he couldn't go and ask questions of legislators about what John Celona was or wasn't doing for the hospital?
A. Well, if he had asked us that he felt it was essential to do that, to -- I think we would have considered it. I mean the original ground rule was -- was just generally stay within the hospital community, maintain confidentiality, but if he had thought and came and asked us, I don't know how we would have reacted because he never did.
Q. Originally, that wasn't the plan, correct, that he go outside the hospital community?
A. No. The plan was that he stay within the hospital community.
Q. And do you remember what kind of time frame he was given in order to produce the report?
A. I would guess that it was somewhere between one month and two months.
Q. Pretty short turnaround, correct?
A. Yes.
Q. Was he hired approximately sometime in May and

lawyer coming in and he disagreed with some of the conclusions of Mr. Saylor, he cooperated in every sense of the word, that we had -- we were in the middle of negotiations with St. Joseph's Hospital, he -- that a lot of this occurred at a time when he was in the throes of working literally around the clock on this Hospital Conversion Act where he was required to represent the hospital and take a lot of -- sort of a public beating on the issue. And a lot of this happened at that time, so the context of it was taken into account.

In addition was taken into account the fact that the -- the hospitals were losing money left and right, in fact, we were hemorrhaging, many of the hospitals in Rhode Island.

My recollection is Rhode Island Hospital lost $40 million because in 1997, maybe 1996 or '97, there was what was called the Budget Reconciliation Act passed by the United States Congress, which cut Medicare drastically.

MR. MATOS: Mr. Licht, I'm sorry for interrupting you, but I think some of the grand jurors need -- two of them have to leave or need a break. Is that -- break?

GRAND JUROR: For me, yeah.

MR. MATOS: Why don't we take ten minutes and come back and then we'll pick up.

THE WITNESS: Fine.

( R E C E S S )

BY MR. MATOS:

Q. Mr. Licht, we're back on the record, and I apologize for having to interrupt you there because of the request for a break, but I want to make sure that you had a full opportunity to provide your answer. So the question was about the dismissal of Robert Urciuoli and what the issues were back and forth, and if there is more that you need to add to that, please do so.

A. And I don't believe I finished and I --

Q. That's why I want to give you that opportunity.

A. And I apologize because I don't remember precisely what I said or didn't say. Can I start over?

Q. Sure.

A. It was a difficult decision. We had clearly an inappropriate use of the hospital funds that had to be reimbursed. We had accepted all of Saylor's recommendations and put into place controls that he recommended and made Bob put it back. That was one recommendation of the executive committee.

The other recommendation was that -- well, it was a lack of recommendation -- we weren't going to recommend the termination of Bob. And the balance -- well, there was a number of items in the context of which this occurred. I think we briefly talked about that. Most of this happened during the Columbia/HCA thing. It doesn't excuse them but it puts them in context.

We were in negotiations with St. Joseph's Hospital. He had performed well. We were having these hospital cuts. We had these Medicare cuts that were really hurting not just Roger Williams Hospital but hospitals throughout New England and maybe throughout the country. As I said, Rhode Island Hospital lost about $40 million. There was his thirty years of what we thought was his good performance.

There were two factions, there was no question about it, and we did not believe that there was anyone within the hospital to -- if Bob weren't there, who could have run the hospital. We didn't have confidence in the number two person.

Q. That would be Maureen McNamara?

A. Maureen McNamara. And we felt that -- we were going through these negotiations with St. Joe's.

did a good job.

And I wasn't alone. Everybody else on the executive committee felt that way, and the board -- it was fourteen to three to one I believe felt that way. There were three people who disagreed, so you're talking about out of eighteen people, one abstained, so I believe it was fourteen thought we should keep him.

GRAND JUROR: So basically I'm to understand that even though he had his, shall we say difficulties, the hospital supported the man because of the hospital integrity or his wishes were going to be questioned. That would be the bottom line?

THE WITNESS: No, no. I think it was that we were in very difficult financial times, and he was -- we believed -- still believe that he was a good hospital administrator, that we were also in negotiations with St. Joseph's Hospital about coming together or merging, and we would need his advice and counsel in those -- there was no one in the hospital who we felt could help step up to the plate and do the job correctly.

The federal government was cutting Medicare significantly that was impacting not only our hospital but other hospitals. Rhode Island Hospital,

my recollection is, lost $40 million in that period of time. We lost several millions of dollars.

So we needed somebody at the helm. Herb Cummings was also there to assist with trying to bring together the two factions in the hospital. And we made a decision. I mean that was the decision that was made.

GRAND JUROR: And it wasn't because of his political influence at all?

THE WITNESS: Whose political influence?

GRAND JUROR: Urciuoli. Evidently, he was connected with Celona.

THE WITNESS: Later, when this meeting was referred to, he was chairman of the committee. Celona, at the time he was hired, in 1998, did not have much political influence. He was a senator, yes, but he did not have influence at the State House. He was a back bencher, and this I know a lot about. There are factions in any legislative body and some are in the majority and some are in the minority, and while he was a democrat, he was what we called a dissident democrat. This happens in politics.

As time goes by, sometimes the dissidents get into a position where they have more authority,

Q. But my question was, was it explored?
A. Was there what?
Q. Was that option explored?
A. Did we go out and search for someone else? No.
Q. Did you explore it in any way?
A. I think we discussed that as an option and the conclusion was that how do you bring somebody in in the middle of merger talks?
MR. SULLIVAN: Just a couple of follow-ups.
BY MR. SULLIVAN:
Q. Mr. Licht, you've mentioned several times in response to questions that these were difficult financial times for the hospital; is that correct?
A. Yes.
Q. How difficult?
A. I can't remember the exact numbers but I think we probably lost several million dollars in the course of a year or two.
Q. And were you doing the things that businesses usually do in times like that, cutting back, laying people off, trying to be financially conservative?
A. Yes.
Q. Now, along comes Dennis Saylor and his report and he tells you, whether you call it criminal

activity or fraud or hands in the cookie jar or inappropriate expenditures, whatever title you put on it, we find out that the president and CEO of the hospital is taking hospital money and using it for his personal benefit; is that correct?

A. That is correct, the finding of Saylor, yes.

Q. And you took action on that finding and made him pay back $17,000; is that correct?

A. That's correct.

Q. The investigation by Mr. Saylor and his firm and the report that he generated cost the hospital a lot of money; is that correct?

A. Yes.

Q. Do you know how much money?

A. No.

Q. Was it more than the $85,000 that he was required to pay back by order of the attorney general?

A. I don't know how much it was.

Q. Does the board also pass on the compensation package for Mr. Urciuoli?

A. The board does.

Q. After Mr. Urciuoli took the hospital's money, caused an expensive investigation, how did the board